UNITED STATES of America,
Appellee,

v.

Patrick M. VIGNEAU, Defendant,
Appellant.

No. 98–1664.

United States Court of Appeals,
First Circuit.

Heard June 8, 1999.

Decided July 22, 1999.

Roger W. Milne, by appointment of the court, for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Margaret C. Curran, United States Attorney, was on consolidated brief for the United States.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LIPEZ, Circuit Judge.

BOUDIN, Circuit Judge.

Two brothers, Patrick and Mark Vigneau, were convicted after a lengthy trial on charges growing out of their participation in a drug distribution scheme. In this opinion, we consider Patrick Vigneau's claims of error; a companion decision in No. 98–1632 addresses Mark Vigneau's appeal. Based on its verdict, the jury apparently accepted the government's version of events, which we summarize at the outset. Patrick Vigneau does not challenge the sufficiency of the evidence.

From around February 1995 to at least the end of that year, Patrick Vigneau and Richard Crandall conducted a venture to acquire marijuana and steroids in the Southwest and resell them in the Northeastern United States. Crandall obtained the marijuana and steroids from suppliers in El Paso, Texas, and in Mexico, and sent the drugs to Patrick Vigneau in Rhode Island and southeastern Massachusetts. Patrick Vigneau, who distributed the drugs to retail dealers, used others to assist him, including his brother Mark Vigneau and one Joseph Rinaldi.

Some of the proceeds from these Northeastern sales had to be sent to Crandall in Texas so that he could pay suppliers and share in the profits. Patrick Vigneau transmitted funds to Crandall primarily through Western Union money orders. The money orders were sent by Patrick Vigneau or others, sometimes in the sender's true name but often using false or

borrowed names. Timothy Owens, who assisted Crandall in acquiring drugs, frequently picked up the checks from Western Union, cashed them, and gave the money to Crandall.

Although some of the drugs were mailed from Texas to Rhode Island or sent through commercial delivery services, Patrick Vigneau and Crandall sought to transport larger quantities over the road. To this end, they purchased two vans in El Paso in March 1995, and registered one in Patrick's name and the other in Crandall's name. Shortly thereafter, Crandall and Owens used the van registered in Patrick's name to deliver marijuana to Rhode Island. They also used U–Haul trucks filled with cheap furniture and concealed the marijuana, which was shrink-wrapped in plastic, behind the furniture. Eventually the authorities gained some knowledge of the scheme.

In September 1995, the DEA intercepted an Airborne Express package with several pounds of marijuana and some steroids addressed to a "David Weiber" at 2 Lyon Avenue in East Providence, Rhode Island, an address at which Patrick's wife Donna Vigneau (legally separated from him) was living and with which Patrick was otherwise connected. On September 8, 1995, law enforcement officers secured a warrant to search the first floor of 2 Lyon Avenue and Patrick's van, which was parked outside. The officers seized mildly incriminating materials from the residence, and more incriminating materials, including a pocket organizer/drug ledger, from the van.[1]

In December 1995, Owens and one Randy Panahi were making a U–Haul delivery of marijuana to Patrick Vigneau when they were halted by the Missouri Highway Patrol. After the Highway Patrol discovered the drugs, both men agreed to cooperate secretly with the DEA. Thereafter and perhaps as a result, the authorities secured Crandall's cooperation. He then arranged to meet with Patrick Vigneau in a Boston hotel on December 28, 1995. Federal agents recorded the meeting on videotape.

In this meeting with Crandall, Patrick Vigneau discussed with Crandall how to continue operations now that the authorities had discovered the U–Haul technique. Although Patrick Vigneau knew that Owens and Panahi were now cooperating with the agents, he did not know that Crandall was doing so as well. During the recorded discussion, Patrick Vigneau referred to his brother Mark Vigneau on several occasions, reporting to Crandall Mark's supposed view that the "best ... way is the train" and that Mark was "not out ... I'd rather have him out." The recording was later introduced into evidence against both brothers at trial.

In May 1997, the grand jury issued a sealed indictment charging Patrick and Mark Vigneau with numerous offenses. Also indicted were Donna Vigneau, Timothy Owens, Joseph Rinaldi, Randy Panahi and one Kyle Robson. Patrick Vigneau was charged with participation in a continuing criminal enterprise, various marijuana offenses, two conspiracies to distribute drugs, and to launder the proceeds, and numerous individual money laundering counts. In due course, the indictment was unsealed and various suppression motions were heard in 1997 and early 1998.

In early 1998, Patrick Vigneau was tried with Mark Vigneau and others in a lengthy trial. Panahi and Owens pled guilty to conspiracy to distribute marijuana and testified for the government. The government dismissed a similar charge against Donna Vigneau. The jury convicted Patrick Vigneau, Mark Vigneau and Joseph Rinaldi (who has chosen not to appeal) on various counts, and acquitted Kyle Robson. Crandall separately pled guilty to a mari-

---

1. The pocket organizer was returned to Patrick Vigneau and then seized again in May 1997, from 25 Kulas Street in West Warwick, Rhode Island. When seized again in May 1997, it was missing the five pages that the government describes as the "drug ledger."

juana conspiracy charge, and his sentence was later upheld. *United States v. Crandall*, 181 F.3d 80 (1st Cir.1999).

At trial, the government relied on the testimony of over 20 witnesses, including Owens and Panahi (who described at length the scheme and their dealings with Patrick Vigneau), and on physical evidence, including seized drugs, the December 1995 videotape, Western Union money transfer records, telephone records revealing much communication between the coconspirators, tax records establishing a lack of other income, and various items seized in the September 1995 search of the 2 Lyons Avenue apartment and white van, including the drug ledger. Crandall was not called to testify. The defendants cross-examined witnesses but did not put on evidence of their own, save for Robson, who testified in his own defense and gave evidence against Patrick Vigneau.

The jury convicted Patrick Vigneau of participating in a continuing criminal enterprise, 21 U.S.C. § 848; possession of marijuana and attempted possession of marijuana (both with intent to distribute) and conspiracy to distribute marijuana, *id.* §§ 841, 846; and 21 counts of money laundering on specific occasions and conspiracy to launder money, 18 U.S.C. § 1956. Patrick Vigneau was later sentenced to 365 months in prison. He now appeals, challenging his conviction but not his sentence.

■ On this appeal, Patrick Vigneau's strongest claim is that the district court erred in allowing the government to introduce, without redaction and for all purposes, Western Union "To Send Money" forms, primarily in support of the money laundering charges. These forms, as a Western Union custodian testified, are handed by the sender of money to a Western Union agent after the sender completes the left side of the form by writing (1) the sender's name, address and telephone number; (2) the amount of the transfer; and (3) the intended recipient's name and location. The Western Union clerk then fills in the right side of the form

with the clerk's signature, date, amount of the transfer and fee, and a computer-generated control number; but at least in 1995, Western Union clerks did not require independent proof of the sender's identity.

Western Union uses the control number affixed by the clerk to correlate the information on the "To Send Money" form with the corresponding "Received Money" form and with the canceled check issued by Western Union to pay the recipient. The original forms are usually discarded after six months, but the information provided by the sender, as well as the information from all records associated with the money transfer, are recorded in a computer database. In this case, for some transfers the government had the forms completed by the sender, but for most it had only computer records.

The government introduced over 70 records of Western Union money transfers. Patrick Vigneau's name, address and phone number appeared as that of the sender on 21 of the "To Send Money" forms (11 other names, including fictional names and those of Mark Vigneau and of other defendants, appeared as those of the senders on the other forms), and those 21 forms corresponded to the 21 specific counts of money laundering on which Patrick Vigneau was ultimately convicted by the jury. Patrick Vigneau's most plausible objection, which was presented in the district court and is renewed on appeal, is that his name, address and telephone number on the "To Send Money" forms were inadmissible hearsay used to identify Patrick Vigneau as the sender.

Hearsay, loosely speaking, is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Whoever wrote the name "Patrick Vigneau" on the "To Send Money" forms was stating in substance: "I am Patrick Vigneau and this is my address and telephone number." Of course, if there were independent evidence that the

writer was Patrick Vigneau, the statements would constitute party-opponent admissions and would fall within an exception to the rule against hearsay, Fed.R.Evid. 801(d)(2) (the rule says admissions are "not hearsay," but that is an academic refinement). However, the government cannot use the forms themselves as bootstrap-proof that Patrick Vigneau made the admission.[2]

Instead, the government argues that the "To Send Money" forms and the computerized information reflecting those forms and the correlated material were admissible under the business records exception. Fed.R.Evid. 803(6). Rule 803(6) provides that business records are admissible where shown to be business records by a qualified witness, "unless the source of information or the method and circumstances of preparation indicate lack of trustworthiness." *Id.* The district judge accepted the view that the Western Union records were trustworthy and admitted the "To Send Money" forms (or equivalent computer records) without redaction and for all purposes, advising the jury that "[w]hat weight you give to them will be your choice."

■ The district judge was correct that the "To Send Money" forms literally comply with the business records exception because each form is a business record,[3] and in this case, the computer records appeared to be a trustworthy account of what was recorded on the original "To Send Money" forms. The difficulty is that despite its language, the business records exception does not embrace statements contained within a business record that were made by one who is *not* a part of the business if the embraced statements are offered for their truth. The classic case is *Johnson v. Lutz*, 253 N.Y. 124, 170 N.E. 517 (N.Y.1930), which excluded an unredacted police report incorporating the statement of a bystander (even though the police officer recorded it in the regular course of business) because the informant was not part of that business. The Advisory Committee Notes to Rule 803(6) cite *Johnson v. Lutz* and make clear that the rule is intended to incorporate its holding.

*Johnson v. Lutz* is not a technical formality but follows directly from the very rationale for the business records exception. When a clerk records the receipt of an order over the telephone, the regularity of the procedure, coupled with business incentives to keep accurate records, provide reasonable assurance that the record thus made reflects the clerk's original entry. Thus the business record, although an out-of-court statement and therefore hearsay, is admitted without calling the clerk to prove that the clerk received an order. *See generally* 2 *McCormick on Evidence* § 286 (4th ed.1992).

But no such safeguards of regularity or business checks automatically assure the *truth* of a statement *to* the business by a stranger to it, such as that made by the

<hr>

2. *Hartzell v. United States*, 72 F.2d 569, 578 (8th Cir.), *cert. denied*, 293 U.S. 621, 55 S.Ct. 216, 79 L.Ed. 708 (1934); *Shaw v. State*, 76 Okla.Crim. 271, 134 P.2d 999, 1015 (Okla. Crim.App.1943) (quoting *Wigmore on Evidence* § 2150 (3d ed.1940)); *cf. United States v. Sutton*, 426 F.2d 1202, 1207–08 (D.C.Cir. 1969). Partial bootstrapping is now explicitly permitted for certain hearsay exceptions, see Fed.R.Evid. 801(d)(2), on the premise that those hearsay exceptions turn upon facts resolved by the judge under Fed.R.Evid. 104(a), *see Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); but the explicit exceptions do not include personal admissions, and whether the defendant signed the form may be governed instead by

Fed.R.Evid. 104(b) as a matter of conditional relevance.

3. A business record is a "memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness...." Fed.R.Evid. 803(6).

bystander to the police officer or that made by the money sender who gave the form containing his name, address, and telephone number to Western Union. Accordingly, the *Johnson v. Lutz* gloss excludes this "outsider" information, where offered for its truth, unless some other hearsay exception applies to the outsider's own statement. This gloss on the business records exception, which the Federal Rules elsewhere call the "hearsay within hearsay" problem, Fed.R.Evid. 805, is well-settled in this circuit.[4] Other circuits are in accord. *See* 5 *Weinstein's Federal Evidence* § 803.11[4], at 803–72 to 803–73 & n. 29 (2d ed.1999).

Of course, "hearsay within hearsay" is often trustworthy but hearsay is not automatically admissible merely because it is trustworthy. A residual hearsay exception exists *based* on case-specific findings of trustworthiness, but it is more stringent and requires, among other things, advance notice not here provided by the government. Fed.R.Evid. 807 (combining former Fed.R.Evid. 803(24) and Fed.R.Evid. 804(b)(5)). And precisely because hearsay law is now codified for the federal courts, the former freedom of federal judges to create new exceptions is now curtailed. Fed.R.Evid. 807 *and* Fed. R.Evid. 803(24), 1974 Advisory Committee Notes to 1974 Enactment.

Nor does the reference to "trustworthiness" in the business records rule comprise an independent hearsay exception. Fed.R.Evid. 803(6). That reference was not designed to limit *Johnson v. Lutz* to untrustworthy statements—after all, the statement to the police officer was probably trustworthy—but rather to exclude

records that would normally satisfy the business records exception (*e.g.*, the clerk's computerized record of calls received) where *inter alia* the opponent shows that the business record or system itself was not reliable (*e.g.*, the computer was defective). *See generally United States v. Moore*, 923 F.2d 910, 914–15 (1st Cir.1991).

Of course, in some situations, the statement by the "outsider" reflected in the business record may be admissible not for its truth but for some other purpose,[5] but the disputed "To Send Money" forms here were admitted by the district court for all purposes, including as proof of the sender's identity. Possibly, the government could have argued as to Patrick Vigneau (it would be harder as to Mark) that other evidence of Patrick Vigneau's activities comprised circumstantial evidence that would permit a jury to conclude that he sent the specific forms bearing his name, Fed.R.Evid. 104(b); but apart from the need for a limiting instruction, Fed.R.Evid. 105, this presents a difficult issue that has not been argued and is not here resolved.

No doubt, the "To Send Money" forms were relevant to the government's case regardless of whether Patrick Vigneau (or any other named sender) was the person who made an individual transfer: they showed transfers of money from Rhode Island directed to Crandall and others that tended to support the general description of the drug and money laundering activities described by the government's witnesses. Thus, the forms could have been offered in redacted form, omitting the information identifying Patrick Vigneau as the sender of 21 of the forms. But that is not what happened.

---

4. *Cameron v. Otto Bock Orthopedic Indus., Inc.*, 43 F.3d 14, 16–17 (1st Cir.1994); *Ricciardi v. Children's Hosp. Medical Ctr.*, 811 F.2d 18, 22–23 (1st Cir.1987); *Gencarella v. Fyfe*, 171 F.2d 419, 421–23 (1st Cir.1948). *United States v. Doe*, 960 F.2d 221, 223 (1st Cir.1992), relied on by the government, may have overlooked this qualification, but if so (and the opinion is not clear on the point), it stands alone.

5. *See United States v. Franks*, 939 F.2d 600, 601–02 (8th Cir.1991) (Federal Express receipts admissible to show that someone received package who signed specific name); *United States v. Lieberman*, 637 F.2d 95, 101 (2d Cir.1980) (hotel registry card admissible to show that someone checked in using specific name).

Some cases have admitted under the business records exception "outsider" statements contained in business records, like the sender's name on the Western Union form, where there is evidence that the business itself used a procedure for *verifying* identity (*e.g.*, by requiring a credit card or driver's license).[6] Probably the best analytical defense of this gloss is that in such a case, the verification procedure is circumstantial evidence of identity that goes beyond the mere bootstrap use of the name to establish identity. While this gloss may well represent a reasonable accommodation of conflicting values, verification was not Western Union's practice at the time.

The hearsay rule is an ancient and, even to most lawyers, a counter-intuitive restriction now riddled with many exceptions. However, the drafters chose to retain the hearsay rule, 5 *Weinstein's Federal Evidence, supra*, § 802App. 100, at 802App.–4 to 802App.–5, and any trial lawyer who has tried to cross-examine a witness whose story depends on the hearsay statements of others understands why. These are reasons enough to tread cautiously, quite apart from the Supreme Court's intermittent reliance on the Confrontation Clause to make the use of hearsay a potentially constitutional issue in criminal trials. *See* 2 *McCormick on Evidence, supra*, § 252, at 126–29.

We thus conclude, in accord with the Tenth Circuit, *United States v. Cestnik*, 36 F.3d 904, 908 (10th Cir.1994), *cert. denied*, 513 U.S. 1175, 115 S.Ct. 1156, 130 L.Ed.2d 1113 (1995), that the sender name, address and telephone number on the forms should not have been admitted for their truth. There is no plausible claim of harmless error, *United States v. Shea*, 159 F.3d 37, 40–41 (1st Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1480, 143 L.Ed.2d 563 (1999), as to 18 of the money laundering counts where, as here, the government might well have had difficulty in tying Patrick Vigneau to any of these 18 specific transactions except through the hearsay statements themselves.

■ The issue is much more difficult as to the three remaining transmissions. For two of them, it appears that the sender's copy of the "To Send Money" forms were among the papers seized from Patrick Vigneau's van, where they were in a suitcase together with other papers connected with Patrick Vigneau. This, we believe, was sufficient circumstantial evidence specific to these documents to allow a jury to conclude that the sender information was indeed an admission by Patrick Vigneau, curing the hearsay problem. *United States v. Black*, 767 F.2d 1334, 1341–42 (9th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985).[7] We note that the government has not supplied us with records that would establish be-

---

6. *E.g., United States v. Reyes*, 157 F.3d 949, 952–53 (2d Cir.1998) (collecting cases); *United States v. Mitchell*, 49 F.3d 769, 778 (D.C.Cir.) (quoting *U.S. v. Patrick*, 959 F.2d 991, 1001 (D.C.Cir.1992)), *cert. denied*, 516 U.S. 926, 116 S.Ct. 327, 133 L.Ed.2d 228 (1995); *United States v. Johnson*, 28 F.3d 1487, 1498 (8th Cir.1994), *cert. denied*, 513 U.S. 1098, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *United States v. Zapata*, 871 F.2d 616, 625 (7th Cir.1989). Courts have also looked to a business's self-interest in assuring the accuracy of the outside information as a possible basis, in some cases, for acceptance of a record within the business records exception. *See United States v. McIntyre*, 997 F.2d at 687, 700 (10th Cir.1993) (rejecting, however, that basis in context of motel ledger), *cert. denied*,

510 U.S. 1063, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994).

7. The court in *Black*, as well as the court in *Johnson*, note 6, above, talks of the evidence as being necessary to "authenticate" the document. Fed.R.Evid. 901. But this is simply another way of saying that there exists evidence, independent of the "hearsay" statement itself, to establish that the document is what the prosecutor claims it to be, namely, a statement by the defendant. Thus, in the special case of business records containing hearsay statements within them, satisfying the requirements of Rule 805 (hearsay within hearsay) should normally satisfy the requirements of Rule 901 (requirement of authentication of writing).

yond all doubt that the two slips do correspond to counts of the indictment.

The independent evidence as to the third transaction is somewhat thinner but still distinguishes it from the other 18. At trial, the government asked Owens about his memory of a transfer occurring on one of the dates charged as a money laundering count. Owens said not only that he remembered the transfer but that Crandall had told him that Patrick Vigneau was the sender. This double hearsay statement might well come in under the co-conspirator exception, although the force of the proof is weakened because we have no idea of the basis for Crandall's statement that Patrick Vigneau was the sender.

Nevertheless, we cannot find the unqualified admission of the computer records harmless even as to these three transactions. While we are inclined to think that a jury would likely have accepted the slips in the van as reflecting transactions by Patrick Vigneau, the defense never had reason to argue the point—and argument was possible—since all of the Western Union records themselves were admitted for all purposes, including identification of the sender. In addition, given limited familiarity with the exhibits, we are somewhat uncomfortable with rescuing these three counts based on a line of argument never articulated by the government.

■ Our conclusion is otherwise as to Patrick Vigneau's conviction for conspiracy to engage in money laundering. True, the admission of computer records as to the 21 transactions where Patrick Vigneau was recorded as the sender was powerful evidence on the conspiracy to launder count. But whereas conviction on the specific transaction counts required a jury to find in each case that Patrick Vigneau had made the specific transaction on the specific date, no such proof was required to convict him on the conspiracy to launder count; and the independent evidence that Patrick Vigneau conspired to launder was extremely strong, at least on a cumulative basis.

That evidence included direct testimony by Owens and Panahi that the drug smuggling scheme—of which Patrick Vigneau was a central figure—also involved remittance of funds from Rhode Island to Texas by means of Western Union money orders; indeed, Owens testified that on one specific occasion, Patrick Vigneau assured him after delivery that the payments to Panahi would be made. Western Union records showing transfers from Rhode Island locations to Crandall were clearly admissible without regard to the sender information as circumstantial evidence that someone was sending funds, and was supported by Owens' own declarations of his role of picking up the Western Union checks in Texas. There is even a brief reference to Patrick Vigneau on the videotape regarding the use of Western Union to transfer funds, although it is quite cryptic.

Thus, substantial evidence indicated that fund transfers were being made incident to the drug smuggling; and Patrick Vigneau's connection to the money laundering scheme was confirmed by his location, his specific promises to Panahi, his videotaped admission and by the Western Union "To Send Money" slips in his van (which reinforce the basic inference even if not treated as an independent guarantee of conviction for these specific transactions). We think it thus "highly probable" that the conspiracy to launder conviction would have followed, even without the disputed computer records. *Shea*, 159 F.3d at 40.

■ The inadmissible hearsay evidence also does not warrant reversal of the counts charging Patrick Vigneau with possession, attempt and conspiracy to distribute marijuana. No doubt proof of his money laundering reinforced these counts as well, but this evidence was dwarfed by the extensive direct and corroborating evidence that Patrick Vigneau was engaged in a drug smuggling scheme. Similarly, the forms were harmless as to the continuing criminal enterprise conviction, because the drug smuggling activities were treated

as the predicate acts to establish a continuing criminal enterprise. 21 U.S.C. § 848. Thus, only the 21 individual money laundering convictions must be set aside.

■ The other difficult issue presented in Patrick Vigneau's appeal concerns the district court's denial of his motion to suppress evidence seized in the September 8, 1995, search of the apartment at 2 Lyon Avenue and from the white Chevrolet van parked outside. The evidence seized at 2 Lyon Avenue principally concerned Donna Vigneau and even as to her was only somewhat incriminating but the items taken from the van were more potent: they included Western Union "To Send Money" forms and the personal organizer/drug ledger. A summary of the events leading up to the seizures is critical to understanding the claim of error.

On September 8, 1995, an East Providence police officer applied for a search warrant that on its face unconditionally permitted the search of the first floor apartment at 2 Lyon Avenue and a white Chevrolet van identified by its license plate for marijuana and other items relating to drug trafficking. However, the affidavit attached to the warrant explained that the Drug Enforcement Administration had intercepted a package being shipped by Airborne Express to "David Weiber" at 2 Lyon Avenue that was found to contain marijuana and anabolic steroids. The affidavit continued:

> This package has been resealed and will be delivered by an undercover police officer posing as an Airborne Express deliveryman. Execution of this search warrant will not take place until approximately (10) to (15) minutes after delivery has been made.

After issuance of the warrant, the police that same day attempted to deliver the package around noon to 2 Lyon Avenue but encountered a note on the door stating: "Leave package here—be back in 15 min; Donna V." The police did not leave the package but kept watch on the property until about three hours later when, to their surprise, a flatbed truck arrived and began to tow away the van. The police then left the package at the door, waited a brief period, and then entered and searched the house. They also intercepted the tow truck and seized and searched the van.

After a suppression hearing, the district court upheld the search. It held that the warrant was an anticipatory warrant that was facially invalid because the "triggering event" for executing the warrant (delivery of the package) was set forth only in the affidavit, but it ruled that the warrant was supported by probable cause, that the officers acted in good faith, and that the triggering event, although not described in the warrant, had in fact occurred prior to the search of the house. As to the van, the court likewise found that the seizure was supported by probable cause and conducted in good faith (and further that the search of the van was justified by exigent circumstances).

At trial the seized evidence was admitted, and Patrick Vigneau now claims this to have been error. The government argues (contrary to the district judge's finding) that Patrick Vigneau had no standing to object to the search of the house and that the evidence in question did not affect the outcome. The government also argues, supported by uniform circuit law across the circuits, that an anticipatory warrant is valid even if the triggering condition is set forth only in the attached affidavit, so long as the condition is actually met.[8] Our own view is that the warrant

---

8. *E.g., United States v. Dennis*, 115 F.3d 524, 529 (7th Cir.1997); *United States v. Hugoboom*, 112 F.3d 1081, 1087 (10th Cir.1997); *United States v. Moetamedi*, 46 F.3d 225, 228–29 (2d Cir.1995); *United States v. Tagbering*, 985 F.2d 946, 950 (8th Cir.1993). The Ninth Circuit, sharing the same view, *United States v. Hotal*, 143 F.3d 1223, 1226–27 (9th Cir. 1998), interpreted our decision in *United States v. Ricciardelli*, 998 F.2d 8 (1st Cir. 1993) as holding otherwise, but *Ricciardelli*

was valid without regard to the condition, mooting the other issues such as standing and harmless error.

Conditional warrants have been upheld where satisfying the condition provided a necessary link in establishing some element of probable cause, *e.g.*, that the recipient of a package containing drugs or child pornography expected its arrival. *United States v. Gendron*, 18 F.3d 955, 965 (1st Cir.), *cert. denied*, 513 U.S. 1051, 115 S.Ct. 654, 130 L.Ed.2d 558 (1994). But in this case, leaving the package at the door did nothing to establish probable cause to search the premises—it was not received by anyone inside the premises—so any concern about whether the condition was satisfied or adequately set forth in the warrant is beside the point.

As it happens, probable cause existed to search the premises *without* delivery of the package. The affidavit asserted that a Warwick, Rhode Island, police detective was familiar with one of the residents at 2 Lyon Avenue, Patrick Vigneau; that he was known to traffic in narcotics and was also known to use his vehicle to transport narcotics; that electricity service at the house was in the name of Donna Vigneau and there was no "David Weiber" listed anywhere on Lyon Avenue; that the van parked outside was registered to Patrick Vigneau, who had also been seen entering and exiting the first floor apartment; and that another package (contents unidentified) addressed to Donna and Patrick Vigneau at the 2 Lyon Avenue address was being shipped there from Texas via Federal Express.

This information standing alone tied Patrick Vigneau to the apartment and the vehicle, but the critical addition was the further statement—also reported in the affidavit—that the DEA had intercepted a package containing marijuana and steroids directed to "David Weiber" at 2 Lyon Avenue. There being reason to believe that no such person resided at that address, the Airborne Express package dovetailed with

the general report that Patrick Vigneau was a drug dealer and suggested at least a fair probability that he was using the 2 Lyon address to cache his drugs. This is enough for a warrant. *See generally United States v. Owens*, 167 F.3d 739, 746 (1st Cir.1999); *United States v. Procopio*, 88 F.3d 21, 28 (1st Cir.1996), *cert. denied*, 519 U.S. 1046, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996).

Admittedly, the claim is slightly weaker as to the van than as to the house, since the package in question was addressed only to the house. But the general report from a police detective that Patrick Vigneau used his van to distribute drugs was entitled to some weight and, where the van was parked outside the house to which drugs were being sent, the sum total of the information created at least a likelihood that Patrick Vigneau used the van for drug distribution and that evidence might reasonably be expected to be found within. All that is required is a "fair probability." *Ricciardelli*, 998 F.2d at 10–11 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■ Patrick Vigneau also objects to the 1997 search of his apartment at 25 Kulas Street in West Warwick, Rhode Island, on the ground that the information in that warrant was stale. In that seizure, the only evidence later admitted at trial was the personal organizer/drug ledger; as already noted, it had been seized from Patrick's van in 1995 and then returned to him after being photocopied by the police. *See* note 1, above. Thereafter, the five pages claimed to comprise the drug ledger had been torn out. At trial, the jury therefore had both the photocopies made in 1995 of the five pages and the 1997 organizer without those pages.

Although the district court rejected the staleness claim and upheld the 1997 warrant, we need not address the merits of this ruling. The five pages seized in 1995

did not address the issue of attached affidavits.

were as part of the pocket organizer enough of a drug ledger to bolster significantly the government's case. The added inferences that someone (likely Patrick Vigneau) had sought to destroy this evidence after the organizer was returned added relatively little in the context of the other evidence against Patrick Vigneau. If it was error to admit the 1997 seizure with the torn-out pages (an issue that we do not decide), it was patently harmless in light of the properly admitted photocopies of those pages derived from the 1995 seizure. *Shea,* 159 F.3d at 40.

■ Patrick Vigneau's remaining claims of error are not substantial. The first concerns the videotape, admitted into evidence over objection, which contained a discussion between Patrick Vigneau and Crandall on December 28, 1995. During the conversation, Patrick Vigneau made a number of statements the jury could reasonably have interpreted as confirming his participation in a drug conspiracy. Although Crandall was now working secretly for the government and was no longer a co-conspirator, Patrick Vigneau's own statements were admissions, and the court told the jury that Crandall's statements were not to be considered for their truth.

■ Patrick Vigneau now objects that the recorded conversations were confusing and should have been excluded under Rule 403, and he points to oblique language in the recording—not surprising in criminal conversations—and potential ambiguities. However, even if the objection was preserved (which the government disputes), the district judge certainly did not abuse his discretion in determining that the relevance outweighed potential confusion. *United States v. Panzardi–Lespier,* 918 F.2d 313, 318 (1st Cir.1990). Since Crandall's statements were not admitted for their truth, there is nothing to the suggestion that the Confrontation Clause was implicated by the failure to call Crandall as a witness to explain what he meant in his own questions or comments.

■ The next claim of error involves the trial court's refusal to strike a purportedly non-responsive and prejudicial answer. Patrick Vigneau extensively cross-examined the government agent about the government's debriefing of Crandall and sought to elicit information about Crandall's criminal history. Defense counsel pressed the agent to admit that even in debriefing Crandall was dishonest, and after securing the admission counsel inquired again, "He [Crandall] held back?". This elicited the following response:

> If your getting—if you want me to say that he's a liar, yes, he is. He lied to the Government, and Mr. Rose and myself felt that we would rather take our chances with Owens and Panahi to present this case because they did not lie to us, And because we did not choose to use Mr. Crandall, we lost a lot of evidence in this case.

The court refused to strike the answer as non-responsive and later denied a defense motion for mistrial based on the same testimony.

To say that Crandall was a liar would hardly hurt Patrick Vigneau, so the concern is with two other statements: that Owens and Panahi "did not lie to us," which Patrick Vigneau asserts is equivalent to improper vouching by the prosecutor, and the implication that Crandall had "a lot of evidence" that the government did not have a chance to use; this, says Patrick Vigneau, amounts to a prosecutor vouching and also relying on information "other than that which has been presented in court." *Patriarca v. United States,* 402 F.2d 314, 321 (1st Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

While government agents are not prosecutors, they sometimes have more knowledge of what should and should not be said than a typical lay witness. And one could argue about the district court's judgment that the complained-of statements—as opposed to the "he's a liar" rhetoric—was fairly responsive to the question. But there was no misconduct by the *prosecu-*

*tor*, and about the most Patrick Vigneau could properly have received was a direction from the jury to disregard the remarks. The failure to give that direction in this case, even if regarded as error, is patently harmless, *Shea*, 159 F.3d at 40, for fairly obvious reasons.

The statement that Owens and Panahi had not lied to the investigators was a single brief reference and can hardly have mattered very much to the jury in assessing the credibility of two witnesses who were deeply involved in criminal activity and who were present for cross-examination and impeachment by defense counsel. As for the "lost a lot of evidence" reference, the jury already knew that Crandall could have testified about the Texas end of the conspiracy; given the overwhelming evidence against Patrick Vigneau on the drug charges, the likelihood that the jury gave any further weight to the "a lot of evidence" statement is too small to be troubling.

 Patrick Vigneau also complains that there were two one-month long continuances during the trial. One, which was beyond anyone's control, occurred early in the trial and was due to a juror's illness; the subsequent delay was due to a break from January 12 through February 10, 1998, because of a scheduled vacation of the judge. None of the defendants objected to the continuances when they were proposed but, when court reconvened following the second continuance, Patrick Vigneau moved for a new trial based on the cumulation of delays.

Counsel was advised in advance that the vacation break would be for 30 days and did not object until *after* the trial was recommenced in February 1998. This amounts to mouse-trapping and suggests review only for plain error which is extremely hard to establish. *United States v. Olano,* 507 U.S. 725, 732–37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In any event, only the most egregious showing of harm could justify the belated motion challenging a decision on trial management. The largely speculative claims of prejudice here offered by Patrick Vigneau do not even come close.

 Finally, Patrick Vigneau objects to the government's plea agreements with Owens and Pinahi, claiming that the consideration they received for their testimony violated 18 U.S.C. § 201(c)(2), as construed in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998). The objection was not preserved in the district court, and in any event, the Tenth Circuit later vacated the decision. *United States v. Singleton,* 165 F.3d 1297, 1298 (10th Cir.1999) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 2371, —— L.Ed.2d —— (1999). Finally, we have recently rejected the position taken in the original *Singleton* decision. *United States v. Lara,* 181 F.3d 183, 196–97 (1st Cir.1999).

Patrick Vigneau's conviction for participation in a continuing criminal enterprise and his convictions on each of the drug counts, including conspiracy to distribute marijuana, and his conviction for conspiracy to launder money are *affirmed;* his convictions for 21 counts of money laundering are *vacated* without prejudice to new trial on those counts; and the sentence is *vacated* and the case is *remanded* for resentencing.

*It is so ordered.*