TEWANI IMPORTS, INC., Ramesh Tewani, Raju Tewani, and Mohan Tewani, Plaintiffs,

v.

NORWEST BANK, N.A., Defendant.

Norwest Bank, N.A., Defendant–Counterclaimant,

v.

Tewani Imports, Inc., Ramesh Tewani, Raju Tewani, and Mohan Tewani, Plaintiffs–Counterdefendants.

Norwest Bank, N.A., Third–Party Plaintiff,

v.

United States Postal Service, Third–Party Defendant.

United States Postal Service, Third–Party Defendant–Counterclaimant,

v.

Norwest Bank, N.A., Third–Party Plaintiff–Counterdefendant.

No. Civ.A. L–99–5.

United States District Court, S.D. Texas, Laredo Division.

March 9, 2001.

---

Adan A. Gonzalez, III, Jones and Gonzalez, Laredo, TX, for plaintiffs.

Horace C. Hall, Hall Quintanilla & Alarcon, Laredo, TX, Judith Reed Blakeway, Strasburger & Price, San Antonio, TX, for defendant.

Hector Carlos Ramirez, Office of U.S. Attorney, Laredo, TX, Richarmond I McKay, Attorney at Law, Washington, DC, for United States Postal Service.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLISON, District Judge.

This action was tried to the Court on January 17–18, 2001. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court now sets forth its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Plaintiff Tewani Imports, Inc. ("Tewani Imports"), is a Texas corporation with its principal place of business in Laredo, Texas. Plaintiffs Mohan and Raju Tewani are officers and 50 percent shareholders of Tewani Imports. Their father, Plaintiff Ramesh Tewani, is the bookkeeper of Tewani Imports.

2. Defendant/Counterclaimant/Third–Party Plaintiff Norwest Bank Texas, N.A. (erroneously sued as Norwest Bank, N.A.), now known as Wells Fargo Bank, Texas, N.A., ("Wells Fargo") is a national banking association with a branch in Laredo, Texas.

3. Third–Party Defendant/Counterclaimant United States Postal Service ("Postal Service") is an agency of the federal government which sells, among other items, domestic and international money orders.

A. *The Money Orders Deposited by Tewani Imports*

4. In 1997, Tewani Imports accepted for payment of goods domestic money orders that had been negotiated in Mexico.

5. In 1997, Wells Fargo, through the Senior Vice–President of its Laredo branch, Mr. Adalberto Nava, informed Tewani Imports not to accept domestic money orders that had been negotiated in Mexico.

6. In October 1997, Tewani Imports began accepting for payment of goods international money orders that had been negotiated in Mexico.

7. In July of 1998, Mr. Nava informed Tewani Imports that approximately 15–18 international money orders

had been returned by the Postal Service.

8. Following a meeting with Mr. Nava, Plaintiff Mohan Tewani, the Secretary of Tewani Imports, informed Mr. Nava that the returned items came from one customer, who had made good on the amount of these items.

9. The customer who had been paying with international money orders is Mr. Antonio Rubin, whom Mr. Mohan Tewani had met in Mexico City.

10. Tewani Imports never saw any of the endorsers of the international money orders that it received from Mr. Rubin. The money orders were delivered to Tewani Imports by a courier named Rodolfo.

11. Tewani Imports never asked Mr. Rubin where he had received the endorsed money orders.

12. Between October 1997 and June or July 1998, Tewani Imports accepted approximately $700,000 in international money orders from Mr. Rubin.

B. *Postal Service Processing of Allegedly Forged Money Orders*

13. Domestic postal money orders are purchased at post offices within the United States, but are no longer negotiated at post offices. They are negotiated at banks throughout the United States, and presented to the Federal Reserve Bank of St. Louis.

14. International postal money orders are also purchased at post offices within the United States, and must be negotiated at banks and other institutions outside the United States. International postal money orders are presented to the Federal Reserve Bank of St. Louis only by domestic banks with an American Banking Association ("ABA") number.

15. Money orders presented to the Federal Reserve Bank of St. Louis are posted on the Federal Reserve's computer system.

16. International postal money orders have a maximum value of $700. Money orders that are negotiated for an amount greater than $700 are immediately noted by a discrepancy between the entry in the Postal Service's sales system and the information received from the Federal Reserve Bank's computer system.

17. A purchaser of an international money order has two years from the date a money order is cashed in which to claim a refund.

18. A purchaser who believes that a money order has been lost or stolen submits a claim through a five-step process. (1) The purchaser presents the money order receipt to any post office (along with a fee of $2.75) and receives a claim form, titled Form 6401. (2) The purchaser and the intended payee both sign the Form 6401 under penalty of perjury, then submit it to the Postal Service's St. Louis office. (3) If the money order has been cashed, the Postal Service notifies the customer and sends him or her a copy, from microfilm, of the front and back of the cashed money order. (4) If the customer believes that someone other than the intended payee cashed the money order, he or she notifies the Postal Service. (5) If the customer completes the preceding step, the Postal Service sends the customer a claim for alleged wrong payment, titled Form 306, which the purchas-

er and payee both sign under penalty of perjury, then submit to the Postal Service's St. Louis office.

19. A customer's Form 6401 inquiry is not a notice to the Postal Service of a problem with the money order. Many customers fill out a Form 6401 simply to receive a copy of the cashed money order. The Postal Service sends out approximately 400,000 copies of money orders each year.

20. The volume of Form 306s received by the Postal Service increased significantly during Fiscal Years 1997 and 1998:

In FY 1996, the Postal Service received 6,557 Form 306s.

In FY 1997, the Postal Service received 42,581 Form 306s.

In FY 1998, the Postal Service received 39,195 Form 306s.

In FY 1999, the Postal Service received 20,113 Form 306s.

In FY 2000, the Postal Service received 10,778 Form 306s.

21. A customer's request for a Form 306 does not necessarily mean that there has been a forgery, or even that the customer will ultimately claim that a forgery has taken place. In FY 1997, customers returned 73.5 percent of the Form 306s mailed by the Postal Service. That figure was 86 percent in FY 1998.

22. The Postal Service tracks in its Form 306 computer database the date on which it initially receives a Form 306 from a customer.

23. After initial receipt of a Form 306, if employees find one or more errors, such as the lack of a required name or signature, the Postal Service returns the Form 306 to the customer.

24. Some Form 306s must be returned to a customer more than once.

25. While the Postal Service awaits a completed Form 306, it requests the actual negotiated money order from the Federal Records Center in St. Louis, Missouri. Because these money orders are sorted by the order in which they are paid, the Postal Service then sends them out to be sorted by serial number.

26. Following the Postal Service's initial receipt of a Form 306, subsequent correspondence from the customer relating to a Form 306 is not date stamped.

27. When a Form 306 is complete, it is bundled with other Form 306s, then sent to the Postal Service's Inquiry Unit, where the information from the Form 306 is entered into the computer system. This information is linked to the money order's serial number.

28. Approximately 90 percent of all completed Form 306s received during the relevant time period involved money orders negotiated in Mexico.

29. Because of the sharp increase in the number of Form 306s received in FY 1997, the Postal Service stopped processing them—and invoicing presenting banks—from November 1997 to January 1998.

30. A casa de cambio is a currency exchange house, which ostensibly profits by trading on the exchange rate between the dollar and the peso. Casas de cambio are commonly used in Mexico for cashing checks.

31. In early 1998, the Postal Service reached an agreement with an association of Mexican casas de cam-

bio ("CDC Association"). Pursuant to that agreement, upon receiving completed Form 306s, the Postal Service sent documentation of all allegedly forged money orders from Mexico to the CDC Association's office in Mexico City.

32. Although the additional step in processing these Form 306s was scheduled to take only 10 days, the CDC Association often did not respond until 26 to 30 days had passed.

33. The CDC Association never proved, to the Postal Service's satisfaction, the legitimacy of any endorsements on international money orders.

34. The agreement between the Postal Service and the CDC Association was discontinued on or about September 24, 1999.

35. Because nearly all money orders negotiated in Mexico were cashed at a casa de cambio, the Postal Service sent all of these money orders to the CDC Association for review.

36. Although Wells Fargo's ABA number was on the back of all the money orders in the instant case, this fact alone does not mean that it was error for the Postal Service to send these money orders to Mexico City. First, all money orders—even those negotiated by a casa de cambio—had to be presented to the Federal Reserve Bank by an American bank. Wells Fargo's ABA number was quite possibly on the back of other money orders originally negotiated at a casa de cambio.[1] Second, sorting money orders into those negotiated at a casa de cambio and those negotiated at

an American bank would have contributed to further delay.

37. After 26–30 days had elapsed for a response from the CDC Association, a Postal Service examiner determines whether to pay or deny the customer's request for a refund.

38. If there are no alterations on the face of a money order, the decision to pay a Form 306 is made by comparing the endorsement on the money order with the payee's signature on the Form 306.

39. If the examiner cannot determine whether the signatures were different, he or she refers the money order and Form 306 to another Postal Service employee.

40. Based on the foregoing evidence, the Court finds that the time for examination pursuant to Domestic Mail Manual § S020.3.2 (Jan.1999) was 26–30 days.

41. Once each week, the Postal Service issues checks for Form 306s that it has decided to pay.

42. A different Postal Service employee invoices banks for paid Form 306s. Because the employee must look at the money order to determine the presenting bank's ABA number, and because the accounts receivable system is not linked to the Form 306 computer system, this process may take an additional 7 to 10 days from the date that the customer is refunded.

43. Based on the foregoing evidence, the Court finds that the time for reclamation pursuant to Domestic

1. *See Casa de Cambio Comdiv, S.A. De C.V. v. Federal Reserve Bank of Minneapolis,* 115 F.3d 618, 620 (8th Cir.1997) (noting that a Treasury check cashed at a Mexican casa de cambio was presented to the Federal Reserve Bank by Norwest Bank, Minnesota, N.A.).

Mail Manual § S020.3.4 (Jan.1999) was 7–10 days.

## II. CONCLUSIONS OF LAW

A. *Evidentiary Rulings*

1. Wells Fargo objected to Postal Service witness Ms. Constance White because her identity was not disclosed pursuant to Fed.R.Civ.P. 26(a)(1), or in response to Wells Fargo's interrogatories. The Court reserved ruling on these objections until the trial was concluded. In view of the substantial overlap of testimony between Ms. White and that offered by Mr. Cuffie in his deposition and at trial, the Court finds that Ms. White's testimony was not prejudicial to Wells Fargo. Contrary to Wells Fargo's assertion that "the USPS has finally arrived at what it has to say, and who has to say it," Ms. White's testimony simply addressed the unresolved questions from Mr. Cuffie's testimony. The processing times and procedures discussed by Ms. White were entirely consistent with Mr. Cuffie's deposition testimony. Her testimony simply filled in some of the blanks from Mr. Cuffie's deposition—such as the operational detail of how Form 306s were processed, as described in ¶¶ 25–27, 37–39, and 41–42, *supra.* Wells Fargo would like to limit the Postal Service to Mr. Cuffie's deposition answers, but because his deposition answers raised questions about the Form 306 examination process, the Court finds Ms. White's testimony to be relevant. Further, although Wells Fargo claims prejudice as a result of the late designation of Ms. White, Wells Fargo was able adequately to cross-examine her. Therefore the Court finds no prejudice as a result of the Postal Service's failure to designate Ms. White at an earlier date.

2. Wells Fargo also objected to Ms. White and to Exhibits 1, 2, and 7, because the identity of the witness and the data compiled in these Exhibits were not disclosed thirty days prior to trial, as required by Fed. R.Civ.P. 26(a)(2)(C). Because Ms. White testified as a fact witness, not an expert witness, this Rule is inapplicable. To the extent that Wells Fargo may be relying on Fed. R.Civ.P. 26(a)(3), governing pretrial disclosures, the Court required that the Joint Pretrial Statement be filed on or before January 8, 2001. Compliance with the Court's order regarding the Pretrial Statement satisfied Rule 26(a)(3). *See Marens v. Carrabba's Italian Grill, Inc.,* 196 F.R.D. 35, 42 (D.Md.2000) (refusing to order disclosure of identity of witnesses and documents under Rule 26(a)(3) "until the pretrial [statement] is submitted").

3. Wells Fargo objected to Postal Service Exhibit 1 because the data compiled in this Exhibit were not disclosed pursuant to Fed.R.Civ.P. 26(a)(1), or in response to Wells Fargo's interrogatories. The Court reserved ruling on this objection until the trial was concluded. Exhibit 1 is a chart summarizing the number of Form 306s mailed, returned, denied, and paid each Fiscal Year from 1996 to 2001. Exhibit 1 is outside the scope of the interrogatory requests cited by Wells Fargo in its Motion to Strike, and not "relevant to disputed facts *alleged with particularity.*" Fed.R.Civ.P. 26(a)(1)(B) (emphasis

added). Until trial, neither party adequately explored the number of Form 306s that were processed during the relevant time period, and the effect that this volume had on the examination of money orders in the instant case. The Court therefore holds that disclosure by the Postal Service in the Joint Pretrial Statement was sufficient.

4. Wells Fargo objected to Postal Service Exhibit 2 because the information compiled in this Exhibit was not disclosed pursuant to Fed.R.Civ.P. 26(a)(1), or in response to Wells Fargo's interrogatories. The Court reserved ruling on this objection until the trial was concluded. Exhibit 2 is a timeline summarizing the processing of Form 306s during Fiscal Years 1997 and 1998. Exhibit 2 is barely within the scope of the interrogatory requests cited by Wells Fargo in its Motion to Strike, and is also "relevant to disputed facts alleged with particularity." Fed. R.Civ.P. 26(a)(1)(B). Nonetheless, the Court finds that Exhibit 2 simply expands on information provided at Mr. Cuffie's deposition, and in Postal Service Exhibit 3. Although Wells Fargo claims prejudice as a result of the late disclosure of this document, it was able adequately to cross-examine Postal Service witnesses about the veracity of this information. Because earlier disclosure would have made no difference, the Court finds no prejudice as a result of the Postal Service's failure to provide this document at an earlier date.

5. Wells Fargo objected to Postal Service Exhibit 7 because the information compiled in this Exhibit was not disclosed pursuant to Fed.R.Civ.P. 26(a)(1), or in response to Wells Fargo's interrogatories. The Court re-served ruling on this objection until the trial was concluded. Exhibit 7 is the Declaration of Edward L. Brown, Manager of the Postal Service Accounting Service Center, including a composite billing history of 696 reclaimed, unpaid international money orders for 1998 and 1999 owed to the Postal Service by Wells Fargo. These money orders have an aggregate value of $224,148. Exhibit 7 is clearly within the scope of the interrogatory requests cited by Wells Fargo in its Motion to Strike, and is also "relevant to disputed facts alleged with particularity." Fed.R.Civ.P. 26(a)(1)(B). Nonetheless, because this information is largely repetitive of Wells Fargo Exhibit 15, and because the parties stipulated that the amount of money orders at issue is $198,749 on the Postal Service's claim, and $95,832 on Wells Fargo's claim, the Court finds no prejudice as a result of the Postal Service's failure to provide this document at an earlier date.

6. Wells Fargo objected to Postal Service Exhibit 16, a letter from Jayne Schwartz, Manager of Corporate Accounting, to the director of the association of *casas de cambio*, dated September 24, 1999. Wells Fargo argues that Exhibit 16 is inadmissible hearsay, but this argument is misplaced. The Postal Service offered this exhibit not to prove the truth of Ms. Schwartz's allegations, but rather to show her letter's independent legal significance. *See* Fed. R.Evid. 801(c) (" 'Hearsay' is a statement ... offered in evidence to prove the truth of the matter asserted."); *Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir.1994) (holding admission of licensing agreement to be

proper, because of its independent legal significance). Specifically, the Postal Service's practice of sending Form 306s to the CDC Association, prior to paying claims and invoicing presenting banks, was discontinued as of September 24, 1999. Mr. Cuffie, although he appeared not to recall the letter, nonetheless authenticated sufficiently the fact that the pilot program was discontinued at approximately that time.

7. Wells Fargo objected to the copies of signed Form 306s contained in Postal Service Exhibits 21, 32 and 33. These exhibits are also not hearsay, and are therefore admissible. The Court recognizes that a Form 306 would be hearsay if the Postal Service were offering it to prove the identity of the signatory. *See United States v. Vigneau,* 187 F.3d 70, 74–77 (1st Cir.1999) (holding inadmissible, in a criminal trial, portions of Western Union "To Send Money" forms indicating the signer's name, address, and telephone number). Here, the Postal Service did not offer the Form 306s to establish the truth of the matter asserted— i.e., that the alleged payees were actually "Evelia Zepeda Miranda" and "Carmen Figueroa." On the contrary, these forms were offered simply to establish that the payees' signatures on the Form 306s did not match those on the negotiated money order. *See United States v. Franks,* 939 F.2d 600, 600–01 (8th Cir.1991) (holding that signatures and addresses on Federal Express airbills were not hearsay, because they "were offered to prove . . . only that the packages were received at [defendant's] address by someone who signed her name"). Further, Mr. Cuffie established an adequate foundation for the admissibility of the Form 306s as business records. *See id.* at 601.

## B. *Burden of Proof Regarding Whether the Money Orders Were Forged*

The Court has already held that, as between Wells Fargo and the Postal Service, the former has the burden of proving the genuineness of all endorsements for money orders that the Postal Service has reclaimed. *See* Order of January 16, 2001, at 16–17. In its pleadings, Wells Fargo failed to allege that any endorsements at issue are genuine, and it failed to offer any such proof at trial.

Wells Fargo now suggests that, under the Postal Service's regulations, some party—either it or the Postal Service—must prove that the endorsements are forged. As a corollary, Wells Fargo argues that because it has guaranteed the prior endorsements, it cannot be charged with proving that the endorsements are forged. Such a claim, it asserts, would breach its duty of good faith to the depositor.

■ This line of reasoning is mistaken. The Postal Service regulations permit the postmaster general to examine money orders for "indicia of . . . forged endorsements." DMM § S020.3.1(e) (Jan.1999). After a finding of forgery, the postmaster general has a reasonable time to demand a refund from the presenting bank. DMM § S020.3.4. Nowhere does the Domestic Mail Manual require a party to prove that an endorsement is forged. On the contrary, once a forgery has been "found," the burden shifts to the presenting bank to prove that the endorsement is genuine. Any other reading of the regulation would render meaningless Wells Fargo's guaranty of prior endorsements.

Even if the Postal Service were to bear a threshold burden of proving that the endorsements were forged, it has carried this burden. The Postal Service's witnesses testified that the Postal Service

compares the endorsement on the money order with the intended payee's signature on the Form 306. This process satisfies the preponderance of the evidence standard.

C. *Postal Service Compliance With DMM §§ S020.3.2, S020.3.4*

1. Wells Fargo's claims based upon theories of voluntary payment and multiple endorsements were dismissed by the Court's Order of January 16, 2001, and need not be addressed here.

2. In its illegal exaction claim, Wells Fargo bears the burden of proving that the Postal Service failed to comply with its regulations. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573, 1578 (Fed.Cir.1996); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967).

3. In the Postal Service's reclamation action, Wells Fargo bears the burden of proving, as an affirmative defense, that it was harmed by the Postal Service's delay in notifying it that the endorsements were forged. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 369, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

4. Although a governmental agency should process claims of forgery more expeditiously, the Postal Service did examine the money orders for forgery within a reasonable time. Especially in light of the unexpected number of claims and the international nature of the market for money orders, that the process took 26–30 days cannot be held to exceed the outer limit of reasonableness. As the Court discussed in its Order of January 16, 2001, delays prior to the receipt of a completed Form 306 are not relevant. At trial,

Wells Fargo raised the issue that the Postal Service could have provided earlier notice to presenting banks—for example, when a Form 306 was first generated—of a possible claim of fraud. This argument is insufficient as a matter of law. First, because only 70 to 80 percent of Form 306s are returned at all, prior notice to banks may be premature, causing unnecessary disputes. Second, and more importantly, Wells Fargo ignores the fact that preliminary notice—and possible objections by presenting banks—would further delay the process of paying customers whose money orders were stolen, and who are entitled to a refund.

5. The Postal Service reclaimed the money orders within a reasonable time. A lag of 7–10 days between the determination that a money order is forged, and the Postal Service's invoice to a bank, is well within the period contemplated by *Clearfield Trust Co.* and the Domestic Mail Manual. Wells Fargo's attempt to distinguish the Postal Service's process from that of other government agencies is unavailing. Ms. Linda Dukart, a fraud examiner for Wells Fargo, testified that the Veterans Administration and the Social Security Administration demand refunds immediately when notice is received that a check to a deceased payee has been negotiated. This testimony, although marginally relevant, is not persuasive on the instant issue. Some time after a person dies, an agency is notified of the person's death, and a notation may be made in the agency's database. *See, e.g.,* 20 C.F.R. § 404.720 (2000) (detailing procedure for notifying Social Security Administration that a person has died). A somewhat

analogous example in the instant case would be a Postal Service money order negotiated for a sum in excess of $700: because the money order is irregular on its face, notation is made immediately by the Postal Service. When the genuineness of a signature is at issue, however, there is no automated method through which the Postal Service demands a refund from the presenting bank. To avoid the possibility of invoicing the wrong bank, the Postal Service has separated the functions of refunding customers and invoicing banks. This procedure is sound, and the slight delay that results is justifiable.

6. Wells Fargo has not shown that it was harmed by the Postal Service's delay in processing the Form 306s. Wells Fargo has maintained an action against Tewani Imports, and the Tewanis individually. Under the standard set forth in *Clearfield Trust Co.*, a bank does not establish its affirmative defense simply because recovery through a law suit is more difficult and expensive than through a setoff of its customer's account.

D. *Attorney's Fees*

No attorney's fees are to be awarded in the instant action, because no statute governs the Postal Service's entitlement to them.

E. *Interest*

██ Title 28 of the United States Code provides that "In suits for balances due the Post Office Department may recover interest at the rate of 6 per centum per year from the time of default." 28 U.S.C. § 2718 (1994). This provision appears in a statutory section addressing debts from defaulting contractors and employees. *See* 28 U.S.C. § 2710. The antecedent circum-

stances here are different, but because the Postal Service seeks a balance due, it is authorized to bring suit. *See* 39 U.S.C. § 2601(a) (1994) (providing that "the Postal Service shall ... collect debts due the Postal Service"). The Postal Service is also entitled to prejudgment interest in the instant action, at the annual rate of 6 percent, from the time of default. Based on the undisputed evidence that Wells Fargo stopped paying the reclaimed money orders in September of 1998, the Court holds that interest should be calculated from September 30, 1998.

### III. CONCLUSION

For the reasons stated above, the Court enters Judgment as follows:

1. Against Wells Fargo on its claims against the Postal Service;

2. For the Postal Service on its claims against Wells Fargo, in the amount of $198,749, plus 6 percent interest, per annum, calculated from September 30, 1998;

3. Each party is to bear his or its own costs and attorney's fees.

IT IS SO ORDERED.