# United States Court of Appeals
## For the First Circuit

Nos. 23-1132, 23-1134

UNITED STATES,

Appellee,

v.

LUIS JAVIER MATTA-QUIÑONES,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe, Circuit Judges.

Jose David Rodriguez-Gonzalez, with whom Rachel Brill, Federal Public Defender, and Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant.

Julia M. Meconiates, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

June 9, 2025

**THOMPSON, Circuit Judge**.  Luis Javier Matta Quiñones ("Matta") appeals his convictions for possession of firearms and ammunition as a prohibited person and possession of a machinegun. At trial, Matta claimed that he was simply in the wrong place at the wrong time and that police officers looking for a success story pinned nearby contraband on him.  To boost his claim, he attempted to cast doubt on police officers' testimony that he threw a feed sack containing guns and ammunition, among other items, onto the roof of a building as he fled.  On appeal, Matta argues the district court prevented him from effectively advancing his defense case in myriad ways.  Because we agree the district court erred in permitting the government's case agent to be a participating presence during jury deliberations, we vacate Matta's convictions and remand for a new trial.  And because his revocation of supervised release sentence was based on those convictions, we also vacate that sentence and remand for re-sentencing.

**BACKGROUND**

## I.   Matta's Arrest

Based on the record, the following events led to Matta's arrest.[1]  In the spring of 2021, police officers were patrolling a

---

[1] Matta's appeal raises multiple issues, which require us to view the trial evidence through different lenses.  Because "the precise manner in which we chronicle the backstory has no impact on our decision," our upfront account of Matta's arrest presents the evidence in a neutral and balanced fashion as it came in at

neighborhood in rural Loíza, Puerto Rico, as part of a planned operation. Hacienda Taino was a local farm in that area and Matta worked there while he served out a supervised release term on a years-old drug conviction. While patrolling a suspected "drug point" in the area in the early evening of April 27, 2021 (a few days before the end of the planned operation), four police officers encountered Matta outside Hacienda Taino. The meet up ended with Matta's arrest and at trial, three police officers recounted the circumstances leading to his apprehension. Officer Angel Cruz-Soto ("Cruz") testified that he "saw several individuals, including [Matta], start moving around the place" when the officers first arrived. On the other hand, according to Officers Eduardo Vidal-Santiago ("Vidal") and Ivan Marrero-Lopez ("Marrero"), Matta was alone and they saw no one else in the area. Officers Vidal and Cruz recalled that they could not see if Matta was holding anything in his hands as they approached, but Officer Marrero testified that Matta was holding a black purse.

All officers testified that when they identified themselves as police, Matta fled. The officers pursued him, taking different routes partly to maneuver around the many rooster cages and other obstacles. During the chase, Officers Vidal and Cruz

---

trial. United States v. Zimny, 846 F.3d 458, 460 n.2 (1st Cir. 2017). When we discuss Matta's challenge to the sufficiency of the evidence, however, we will take that evidence in the light most favorable to the jury's verdict. Id.

- 3 -

saw Matta was holding a plastic sack for animal feed, which he threw onto the roof of a structure used to house roosters, but Officer Marrero testified that he never observed Matta holding a feed sack. Eventually, officers caught up to Matta and arrested him. After the arrest, Vidal retrieved the feed sack from the roof. When he returned to Matta and his fellow officers, Vidal opened the sack in front of Matta who denied ownership of its contents. The officers could see through the plastic that the sacks contained ammunition. The officers brought Matta and the feed sack to their station and processed the evidence. The sack contained (1) more than 300 rounds of ammunition split across 8 plastic bags, and (2) a black purse which in turn held two cell phones, two pistols, and multiple loaded magazines for those pistols. Matta was eventually indicted on two gun-related charges and in due course trial got underway. Aspects of what happened there lead us here.

## II. <u>Jury Deliberations</u>

During closing arguments, Matta emphasized inconsistencies in the officers' testimony, the absence of photographs depicting items inside the feed sack or black handbag as officers claimed to have observed and recovered them, and the fact that none of the officers could describe when and how Matta had acquired the feed sack. A key part of Matta's case was his assertion that he lacked the physical ability to throw the feed

sack, with all its contents, up onto the roof of a building ⸺ which was tall enough that Vidal had to climb a ladder to retrieve the sack ⸺ while fleeing the police. As part of its deliberations, Matta urged the jury to recreate the weight of the feed sack by placing all the objects allegedly recovered from the feed sack into the sack and testing its weight for themselves.

On the second day of deliberations, the jury sent a note with several questions to the district judge, including a request to have "all the physical evidence be brought to the deliberating room." The district court shared the note with the parties and announced its intent to have "all the physical evidence . . . brought to the deliberating room except for the weapons and the ammunition." As to the guns and ammunition, the court determined the jurors could "come to the courtroom and take a look at it in the presence of the agent" (more on the "agent" or the "case agent" in a bit).

Multiple times during this conference, Matta requested that the district court modify the in-court procedure it had settled upon regarding the jurors' viewing of the firearms and ammunition. First, the defense asked that the jury be allowed to "carry the ammunition in the presence, obviously, of the agent or of the CSO." (The abbreviation "CSO," which we'll also use throughout this opinion, stands for the court security officer). In response to this request, the district court drafted and shared

with counsel a proposed note which informed jurors that they could "view and handle the firearms and the ammunition in the courtroom with the case agent present." After hearing the revised instruction, Matta objected, saying that "our request would be for the firearms and ammunition also to be brought to the deliberating room." The district court denied the request, saying "the case agent has to be present when they view and handle the firearms. The case agent cannot say a word." The district court further clarified that only the CSO, a United States marshal, and the case agent would be allowed in the courtroom while the jury examined the firearm and ammunition.

Although the conference turned to the other juror questions, Matta continued to return discussion to the viewing of the guns and ammunition. He asked the court to consider allowing the jurors to bring the feed sack into the courtroom, "since they are only allowed to see the ammunition and firearms here in the courtroom in the presence of the case agent," so the jurors could put the firearms and ammunition into the sack as Matta had suggested during his closing argument. The district court said if the jury asked for the feed sack to be brought into the courtroom, the district court would allow it, but refused to preemptively respond to a request the jury had not expressly made in its note.

After the court and parties concluded discussion of the jury's remaining requests, the prosecution asked if the district

court had "any specific instruction" to give the case agent. The district court responded that the case agent should "keep his mouth shut." It then elaborated that the jury should be permitted to handle the firearm, and that the case agent should not "explain what the firearm is" or "point to any part of the firearm." At that point, Matta proposed that the case agent sit in the first bench of the courtroom instead of at the table where the jurors would handle the evidence, because the defense did not "want the jury to feel uncomfortable." The district court responded that "[t]he agent is going to have to give the weapon to the jury and will have to stand near the weapon while it's being handled."

Under the district court's direction, the jury, during its ongoing deliberations, examined the firearms and ammunition inside the courtroom with the case agent, CSO, and marshal present. A brief aside: the "case agent" was an FBI special agent who had been introduced to the jury at the start of the trial, sat at the government's counsel table throughout the trial, and assisted the government attorneys with the handling and publication of an exhibit (one of the firearms). Presumably, pursuant to a local rule, the case agent retained possession of the firearms throughout the course of the trial, even after they had been submitted into evidence. D.P.R. Loc. R. 123. During the presentation of the government's case, the judge once reprimanded the case agent for

pointing to a specific part of the firearm that the agent was displaying to the jury.

That afternoon, the jury returned a unanimous guilty verdict on both charges.

## III. <u>Post-Trial Motion and Appeal</u>

After the trial ended, Matta moved for a judgment of acquittal based on insufficiency of the evidence, and for a new trial, contending that allowing the case agent to present the firearms and ammunition to the jury, outside the presence of the defendant and counsel, deprived him his right to a fair and impartial trial under the Sixth and Fourteenth Amendments. The district court denied both motions in a combined order. As to the motion for a new trial, the district court first reasoned that Matta had only objected to the location where the firearm and ammunition could be viewed (i.e., in the courtroom) and had waived any objection to the presence of the case agent. Further, the district court decided that Matta's juror contact claim failed on the merits because (1) the case agent's contact was "brief and *de minimis*," (2) "the presence of the CSO and the Marshal mitigated the risk of any unauthorized communication," and (3) the procedure was "a transparent accommodation to ensure jury safety" to which the defense consented. Separately, the court concluded the evidence was sufficient to support Matta's convictions. Having resolved the post-trial motions, the district court sentenced

Matta to 96 months' imprisonment, and revoked his supervised release and gave an additional 18 months' immurement for the revocation to be served consecutively.

## DISCUSSION

On appeal, Matta offers various reasons why we should vacate his convictions and associated prison sentences. In our view, Matta's sufficiency argument is not a winner. But his argument about the case agent's presence during the jury's examination of the physical evidence is. Because we conclude that Matta made out a colorable claim of juror misconduct which the district court did not investigate, we vacate Matta's convictions and sentence and remand for a new trial. We also address two evidentiary rulings by the district court, because disputes regarding the same evidence would likely recur at a new trial. We do not reach Matta's remaining claims of error.[2]

## I.   Sufficiency of the Evidence

We start with Matta's claim that the evidence introduced at trial was insufficient to support his two convictions for possession of a firearm as a prohibited person, 18 U.S.C. § 922(g), and for possession of a machinegun, id. § 922(o). We begin here because if Matta is successful, our ruling would not only overturn

_____

[2] Those remaining arguments go to the appearance of bias by the district court, cumulative error, and improper consideration of the facts at sentencing.

- 9 -

his convictions, but also bar the government from re-trying him on those charges under the Double Jeopardy Clause of the Fifth Amendment, rendering his remaining claims of error moot. See United States v. Gonzalez-Sanchez, 825 F.2d 572, 588 n.56 (1st Cir. 1987) ("Even if the appellate court finds alternative grounds for reversal, it must consider the defendant's challenge to [the] sufficiency of the evidence to ensure that the prohibition against double jeopardy is upheld."); see also United States v. Szpyt, 785 F.3d 31, 36 (1st Cir. 2015) ("'[O]nce [a] reviewing court has found the evidence legally insufficient,' a second trial is 'preclude[d]'" (second and third alteration in original) (citation omitted)).

Because Matta preserved this challenge, we apply de novo review. United States v. Soler-Montalvo, 44 F.4th 1, 7 (1st Cir. 2022). Our goal is to "determine whether 'any reasonable jury could find all the elements of the crime [proven] beyond a reasonable doubt.'" Id. (quoting United States v. Seary-Colón, 997 F.3d 1, 11 (1st Cir. 2021)). We make that determination taking the record "in the light most favorable to the verdict," giving "the prosecution the benefit of all sensible inferences and credibility choices." Id. at 8 (citations omitted). Matta claims that the government failed to prove that he possessed the modified pistols and that he had knowledge that the pistols were machineguns. We address each argument separately.

**A.  Possession**

Matta claims the government did not prove his possession of the contraband on either count, because "[t]he [police] officers' testimonies were fatally contradictory and inconsistent."  But the evidence viewed favorably to the verdict is sufficient.  Officers Cruz and Vidal testified that as Matta fled from police, he threw the feed sack he was holding onto the roof.  And Vidal further testified that he retrieved the feed sack from the roof.  At the scene, officers could see the sack contained ammunition, and they ultimately recovered the guns, ammo, and a cell phone belonging to Matta inside.[3]  A rational jury was entitled to credit this testimony and conclude that Matta literally possessed the feed sack and its contents and sought to discard the sack to avoid being caught with contraband.  This would be a sufficient basis for finding he possessed the prohibited items. See United States v. Pena, 586 F.3d 105, 112 (1st Cir. 2009) (concluding that a rational jury could have convicted the defendant for possession of cocaine where a witness testified to seeing him discard objects while fleeing from police and the police then recovered his cell phone, a gun bearing his fingerprint, and a plastic bag of cocaine along the flight path).

---

[3] Matta stipulated that one of the two cell phones submitted into evidence belongs to him, but as we'll discuss in more detail, disputes that police seized his cell phone from within the feed sack.

- 11 -

Matta resists this conclusion by highlighting portions of the police officers' testimonies that were inconsistent. But "[e]vidence does not become legally insufficient merely because of some inconsistencies in witnesses' testimony." United States v. Ayala-García, 574 F.3d 5, 12 (1st Cir. 2009) (citation omitted) (explaining that arguments based on "discrepancies in the testimony of the government's witnesses" are "unavailing"). Rather, "we must assume that the jury credited those witnesses whose testimony lent support to the verdict" and cannot "second-guess the jury's credibility calls." Soler-Montalvo, 44 F.4th at 8 (citations and quotation marks omitted). Nor do we think the absence of any photographs of "the rounded-up evidence" (that is, photographs showing the firearms and ammunition within the black purse and feed sack) renders the evidence insufficient, despite Matta's urging to the contrary. Matta was free to argue to the jury that the absence of such evidence was significant —— and in fact he did just that.[4] On appeal, however, "[t]he fact that the government did not present certain kinds of evidence does not [necessarily] mean that there was insufficient evidence for

_____

[4] The record reveals that the jury heard and considered his argument —— going so far as to ask the district judge if any "report and/or photos of the evidence recollected in the police precinct [were] available" (which they weren't) —— but found against him despite that absence. See United States v. O'Shea, 426 F.3d 475, 481 (1st Cir. 2005) (explaining that a note sent by the jury indicated that "the jury was doing its job" and that the jury "considered [defendant's] theory . . . but rejected it").

conviction." United States v. Forty-Febres, 982 F.3d 802, 807 (1st Cir. 2020) (second alteration in original) (citation omitted) (concluding that the lack of DNA or fingerprint evidence placing the appellant at the scene of the crime did not amount to insufficient evidence because the jury could have rationally convicted based on victims' testimony); see also United States v. Rivera-Rodríguez, 617 F.3d 581, 599 (1st Cir. 2010) (concluding that the jury could have convicted on the drug conspiracy charge based on witness testimony, even where there was no audio, video, or photograph of the appellant committing the crime nor any contraband seized in his presence).

In his reply brief, Matta attempts to fit this case into the "'extremely narrow' exception" our Court has carved out for cases where a witness's material testimony "is so inherently implausible that it could not be believed by a reasonable juror." United States v. Garcia, 978 F.2d 746, 748 (1st Cir. 1992) (citation omitted). But there is nothing inherently impossible or incredible about Vidal's and Cruz's accounts that they saw Matta running with the feed sack and throw it onto the roof of a structure, or about Vidal's testimony that he later retrieved the feed sack from the rooftop. Indeed Cruz's and Vidal's accounts

- 13 -

largely corroborate each other.[5]  See United States v. Rivera-Donate, 682 F.3d 120, 135 (1st Cir. 2012) (concluding that witnesses' accounts were not "facially incredible" where they corroborated each other).  Matta theorizes that the officers' accounts are facially incredible because they "cannot all be accurate" and "[t]he differences are simply too great."  But viewing the evidence in the light most favorable to the verdict as we must, some of the inconsistencies in the witnesses' testimonies could be chalked up to faulty memory or poor visibility.  More importantly though, Matta cites no authority supporting the

<hr />

[5] We reach this conclusion over Matta's argument that consistent portions of Vidal's and Cruz's accounts were rendered facially incredible by the fact that they testified inconsistently as to the presence of unknown individuals at the scene.  Although the inconsistency might go to the officers' credibility and to the weight afforded it as Matta argued unsuccessfully to the jury, we see no reason why uncertainty as to the number of people present would have so undermined the rest of the officers' accounts as to render them implausible.  See United States v. Washington, 434 F.3d 7, 15 (1st Cir. 2006) (affirming conviction where "minor consistencies" fell "far short of rendering the testimony facially incredible").

Matta also emphasizes that Vidal's testimony about retrieving the feed sack from the roof of a farm building was uncorroborated.  But we have held that uncorroborated testimony from a single witness can sustain a conviction, unless the testimony is inherently improbable.  See Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009) (explaining in context of habeas petition that "a criminal conviction can rest on the testimony of a single eyewitness" even if "the eyewitness's testimony is uncorroborated and comes from an individual of dubious veracity").  Nothing about Vidal's account of retrieving the feed sack was inherently improbable.  Nor is there anything remarkable about the fact that no other witnesses could corroborate an act Vidal performed alone.

proposition that we can overturn a conviction because the witnesses' testimony was too "different," as opposed to inherently improbable.  See Seary-Colón, 997 F.3d at 13 (concluding that witness accounts of robbery were not "inherently improbable" even though one witness could not remember what defendant said and portions of second witness's testimony were inconsistent with both prior statements to law enforcement and physical evidence at the scene (citation omitted)).  Faced with competing stories about what Matta had in his hands on the evening of the arrest, the jury did not need to envision a universe in which all three officers' accounts were comprehensive, completely accurate, and 100% consistent; it was free to credit portions of the officers' accounts while discrediting others.  See United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) (recognizing that the jury "may accept or reject, in whole or in part, any testimony").

Accordingly, we hold there was sufficient evidence for a rational jury to conclude that Matta possessed the firearms.

B.  **Knowledge of Machinegun Characteristics**

Second, Matta claims that the government did not prove he knew that the pistols in the black purse, retrieved from the tossed sack, were machineguns.  To prove illegal possession of a machinegun under 18 U.S.C. § 922(o), "the government must prove that 1) the defendant possessed or transferred a machinegun 2) with knowledge that the weapon had the characteristics to bring it

within the statutory definition of a machinegun."  United States v. Torres-Pérez, 22 F.4th 28, 32 (1st Cir. 2021) (quoting United States v. Tanco-Baez, 942 F.3d 7, 26 (1st Cir. 2019)).  To clarify, the government does not need to prove that Matta knew "that the gun was in fact considered a machine gun under federal law," only that the gun had "characteristics that brought [it] within the statutory definition."  Id. at 33 (quoting United States v. Nieves-Castaño, 480 F.3d 597, 599 (1st Cir. 2007)).  The relevant statute defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  Id. at 32 (quoting Nieves-Castaño, 480 F.3d at 599); see 18 U.S.C. § 922(a)(4) (defining machinegun with reference to 26 U.S.C. § 5845(b)).[6]  The government may prove Matta's knowledge with circumstantial evidence, including "external indications signaling the nature of the weapon."  Id.  The extent to which the defendant handled the weapon, the defendant's familiarity with firearms, the presence of accessories that would be used with an automatic weapon, and the defendant's efforts to avoid discovery

---

[6] This definition captures fully automatic weapons which fire multiple bullets with one trigger pull, but not semi-automatic weapons, which fire one bullet per trigger pull. Nieves-Castaño, 480 F.3d at 600 (citing Staples v. United States, 511 U.S. 600, 602 & n.1 (1994)).  When we refer to a weapon firing "automatically" in this opinion, we refer to fully automatic weapons, rather than semi-automatic weapons.

may also be relevant considerations.  See, e.g., United States v. Pérez-Greaux, 83 F.4th 1, 27 (1st Cir. 2023); Torres-Pérez, 22 F.4th at 33; see also United States v. Shaw, 670 F.3d 360, 364-65 (1st Cir. 2012) (applying similar analysis to determine whether defendant had knowledge that a sawed-off shotgun had characteristics falling within the statutory definition of a firearm under 26 U.S.C. § 5845(a)(2)).

We acknowledge this may be a close call, but viewing the evidence in the light most favorable to the government, we conclude there was sufficient evidence to sustain the conviction.  Because Matta's personal cell phone was found alongside the pistols in the black purse, the jury could have inferred that Matta had been inside the purse and was familiar with its other contents.  See Torres-Pérez, 22 F.4th at 33 (concluding that the jury could infer that defendant possessed a machinegun because the government presented evidence "connecting [defendant] to the truck" where the machinegun was recovered, such as his wallet, identification cards, and cell phone).  The modifications to the pistols were externally visible,[7] and the jury had the opportunity to view the firearms up close and gauge whether Matta would have noticed the

_____

[7] The trial evidence showed that a small piece of metal stuck out from the plastic plate which covers the back of each pistol's slide.  The plastic plate on one pistol was also modified with a skull illustration.  The government's firearm expert testified that the metal piece on each pistol allowed the pistols to fire automatically.

modifications and understood their purpose.  See Pérez-Greaux, 83
F.4th at 27.  And the storage of high-capacity magazines in the
same container as the pistols supports an inference that Matta was
aware of the pistols' ability to fire a large number of bullets in
an extremely short period of time.[8]  Id. (concluding that the jury
rationally inferred defendant's knowledge of the automatic firing
capabilities of gun which he "stored . . . in the same bag as a
thirty-round magazine"); Torres-Pérez, 22 F.4th at 33 (concluding
that the jury could infer defendant's knowledge that modified
pistol could fire automatically in part because the pistol "had an
extended magazine to accommodate additional ammunition").  This
evidence distinguishes the present case from Nieves-Castaño, cited
by Matta, where the only evidence that the defendant had ever been
inside a golf bag from which a modified firearm was seized was her
statement to an investigator that she had once "looked in" the
bag.  See 480 F.3d at 599, 601 (explaining that "there was no

---

    [8]  Matta claims that the extended magazines were found in the
feed sack and the pistols were found in the black purse. Therefore,
he argues, "the presence of the extended magazines reveals nothing
about Mr. Matta's knowledge about the firearms in a separate bag."
As an initial matter, we note that Officer Vidal testified on
direct examination that the magazines were recovered from the black
purse, and we are required to take the evidence in the light most
favorable to the guilty verdict.  Moreover, even if we credit
Vidal's later testimony that the magazines were actually found in
the feed sack, we are not persuaded that because the pistols were
found instead in the black purse, the jury's inference was
irrational.  After all, the black purse itself was in the feed
sack.

- 18 -

evidence that one would see, simply by looking into the golf bag, a small mark on the weapon between the fire and safety settings").

Matta claims the visibility of the pistols' structural modifications was not enough to infer knowledge, because only an individual with "years of training and experience," like the government's firearms expert, would have been able to tell from merely seeing the small metal part that the pistols were capable of automatic firing. But the government is not required to "present evidence that a layperson (rather than an expert) could draw the conclusion, simply by looking at the firearm, that it had been modified to a machinegun," where other evidence reasonably permits an inference that the defendant understood the purpose of the modification. See Pérez-Greaux, 83 F.4th at 27. Certainly Matta has a point that there is no *direct* evidence that Matta ever handled the pistols, nor any evidence about Matta's overall familiarity with firearms. We are also skeptical of the government's argument that the requisite knowledge can be inferred from Matta's flight in this case given that Matta had previously been convicted of a felony and was thus prohibited from possessing any form of firearm.[9] However, a defendant's knowledge frequently

_____

[9] As a prohibited person, Matta would have faced criminal consequences for possessing any type of firearm, regardless of whether it was a machinegun. 18 U.S.C. 922(g). And thus his flight does little to establish his knowledge of the pistols' automatic firing capability. See Nieves-Castaño, 480 F.3d at 601

cannot be proven by direct evidence. United States v. Agosto-Vega, 617 F.3d 541, 549 (1st Cir. 2010); see Staples, 511 U.S. at 615 n.11 (explaining that "knowledge [of machinegun capabilities] can be inferred from circumstantial evidence"). Here, the visibility of the modifications and proximity of Matta's cell phone to the altered weapon and extended magazines permit the inference that Matta was sufficiently familiar with the pistols to know they were capable of automatic fire. And the fact that the circumstantial evidence does not "compel a finding of [guilty] knowledge" is no reason to reverse the conviction for insufficient evidence. United States v. Kilcullen, 546 F.2d 435, 441 (1st Cir. 1976). Accordingly, the evidence was sufficient to support both Matta's convictions. Onto Matta's next appellate challenge.

## II. **Jury Contact**

Before turning to the substance of Matta's claim that the district court erred by allowing the case agent to present the firearms and ammunition to the jury during its deliberations, we first consider whether Matta properly preserved this claim for appeal. A litigant forfeits the right to complain on appeal about "an improper occurrence in the course of trial or an erroneous ruling by the trial judge" unless he "object[s] then and there." United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995).

---

("[K]nowledge that one is guilty of *some* crime is not the same as knowledge that one is guilty of the crime *charged*.").

Forfeited issues can only be reviewed on appeal for plain error, a somewhat "difficult-to-meet" standard, United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010), that permits reversal of only "blockbuster errors and not ordinary backfires," United States v. Chen, 998 F.3d 1, 7 (1st Cir. 2021) (quoting United States v. Salley, 651 F.3d 159, 164 (1st Cir. 2011)).  If a party not only fails to object, but purposefully abandons its claim of error, it waives the issue and generally cannot challenge the issue on appeal, even for plain error.  Id. at 6.  To avoid these pitfalls, litigants in district court must object proactively if they want to preserve their future appellate arguments.  Taylor, 54 F.3d at 972.  This requirement is not imposed simply to set "judicial trap[s]"in the path of "the unwary litigant," United States v. Griffin, 818 F.2d 97, 99 (1st Cir. 1987), but to dissuade sandbagging and to ensure that district courts have a complete picture of the issues in dispute,[10] see Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 15 (1st Cir. 1999) ("The basis for [the preservation] requirement is obvious:  the judge must largely rely upon the parties to research and raise issues, and giving the judge

---

[10] Sandbagging in this context refers to a party's "tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error" to the district court's ruling on appeal, or, in a more egregious case, "planting an error and nurturing the seed as insurance against an infelicitous result." Taylor, 54 F.3d at 972; see also United States v. Franklin, 51 F.4th 391, 400 (1st Cir. 2022).

the wrong reason for a request is usually equivalent to giving the judge no reason at all."); Griffin, 818 F.2d at 100 (explaining that the purpose of the objection requirement is to "give[] both the court and the party's opponent fair warning and a timely opportunity to acknowledge bevues and correct them so that cases can be decided squarely on merit"). Thus, we treat arguments as preserved only if litigants "said enough to alert the [district] court to the theory now being propounded" on appeal. Bryant v. Consol. Rail Corp., 672 F.2d 217, 220 (1st Cir. 1982) (explaining that an objection for "relevancy" did not preserve a party's argument that the evidence was inadmissible character evidence); see United States v. Perez-Delgado, 99 F.4th 13, 20 (1st Cir. 2024) (explaining in procedural sentencing appeal that "a defendant's objection need not be framed with exquisite precision" and need only "put[] the district court on notice of the error" (citations and quotation marks omitted)).

The government argues that Matta "never made any objection that could be interpreted as an improper contact claim" at the time the district court ruled that the jury must view the weapons and ammunition in the presence of the case agent. We've already described in detail the conference between the parties and the district court regarding the jury's request to have the physical evidence brought to the jury room, so rather than go through another play-by-play, we'll simply highlight the most

salient moments in our analysis here.  In our view, the defense made two objections regarding the case agent's proximity to the deliberating jurors, which in combination and in context, were sufficient to preserve the issue now on appeal.

First, early in the conference, defense counsel lodged an objection and requested that "the firearms and ammunition also . . . be brought to the deliberating room" alongside the other evidence, instead of to the courtroom for a separate showing in the presence of the case agent.  The government views this as a request to allow the jury to test the combined weight of the items in the feed bag, rather than to the case agent's presence. But we think it fair to characterize Matta's request, at least in part, as an attempt to prevent contact between the case agent and the jurors given the background rule that, to ensure the secrecy and privacy of deliberations, non-jurors are not permitted in "the deliberating room."  See United States v. Olano, 507 U.S. 725, 737-38 (1993) (discussing the presence of alternate jurors in the deliberating room and recognizing the "cardinal principle that the deliberations of the jury shall remain private and secret" to "protect the jury's deliberations from improper influence"); Little v. United States, 73 F.2d 861, 864 (10th Cir. 1934) (reversing conviction where the district court sent a stenographer into the jury room to read aloud the jury charge and explaining that "no one should be with a jury while it is engaged in its

deliberations"); see also Peña-Rodriguez v. Colorado, 580 U.S. 206, 236 (2017) (Alito, J., dissenting) ("To protect that right [to trial by a jury of peers], the door to the jury room has been locked, and the confidentiality of jury deliberations has been closely guarded."). The district court's response to the request shows that it was, in fact, operating under the assumption that the case agent could not have remained with the evidence had it been sent to the jury room. Specifically, the district court said, "Denied. No, no. No way. No way, because the case agent has to be present when [the jurors] view and handle the firearms. The case agent cannot say a word."

The district court's order that the agent remain silent shows us a key piece of the context surrounding Matta's objections. Namely, the court apparently recognized and tried to address the risk that the case agent could improperly influence the jury. This was not some obscure, improbable event that the district court had never considered. After all, the district court had already reprimanded the case agent once during the trial for pointing to one of the pistols (i.e., improperly testifying). The risk was apparently so self-evident that, at the end of the conference, the government asked if the district court had any "specific instruction" for the case agent. The district court issued even broader instructions seemingly in response to the risk of improper influence: it told the agent to "keep his mouth shut" and forbade

the agent from "explain[ing] what the firearm is" or "point[ing] to any part of the firearm." Immediately following the delivery of these instructions, defense counsel made a second and final attempt to separate the case agent from the jury, requesting that "the agent sit in the first bench instead of at the table right where [the jurors] are going to handle the evidence," because "[w]e don't want the jury to feel uncomfortable." Given the nature of the case-agent instructions the court had just announced, we believe Matta's request fairly captured his disagreement with the proximity of the case agent to the jury and his concern that this court-sanctioned closeness would adversely impact the jurors in their deliberations. See Cohen v. Brown Univ., 16 F.4th 935, 944 (1st Cir. 2021) (concluding that an argument was preserved where "we have no reason to doubt that the district court grasped the gist of the [party's] argument" even though it was not made "with lapidary precision"); see also Perez-Delgado, 99 F.4th at 20 (concluding that the defendant's sentencing challenge was preserved even though "defense counsel could have offered some greater specificity in his objection" where "the broader context of this particular sentencing hearing makes it 'contextually clear' that defense counsel's objection . . . put the district court sufficiently on notice" of the basis for the objection (citation omitted)); United States v. Meises, 645 F.3d 5, 20 (1st Cir. 2011) (reviewing "the full context of counsel's colloquy with

the court in determining whether a [Confrontation Clause] challenge was preserved").

We acknowledge that defense counsel could have pressed more forcefully at this point for the case agent not to be present at all. But in our view, the district court, having heard Matta's requests and having decided on a different outcome, "made it perfectly clear that [it] d[id] not wish to hear what [his] lawyer[s] ha[d] to say." United States v. Toribio-Lugo, 376 F.3d 33, 41 (1st Cir. 2004). The district court was seemingly adamant from the beginning of the conference, presumably in conformity with its local rule, D.P.R. Loc. R. 123, that the case agent be present. In such an environment, defense counsel was not required to "persist stubbornly" and risk the judge's ire. Id. ("To do her job, a lawyer must be forceful, but she also must handle her relationship with the presiding judge with care."); see United States v. Teixeira, 62 F.4th 10, 18 (1st Cir. 2023) ("Interrupting a judge in mid-stride is risky business for a lawyer."). Resisting this conclusion, the government urges that the "mere mention" of the jurors' comfort was insufficient to "adequately preserve an argument regarding improper juror contact." But we do not mechanically require objecting litigants to "use any particular form of words," or for that matter, "cite to the specific rule" or case that applies when making a contemporaneous objection, Bryant, 672 F.2d at 220, particularly where, as here, the long-standing

default rule is juror secrecy and privacy, see Olano, 507 U.S. at 738. And we will not penalize Matta for his counsel's laxity in explaining more clearly the basis of the objection when it is evident from the record that counsel was not afforded an opportunity to do so. See United States v. Fernandez-Garay, 788 F.3d 1, 4 (1st Cir. 2015) (treating all claims of sentencing error as preserved where the district court "cut defense counsel's argument short, precluded further argument, and did not allow the lawyer to complete the record").[11]

The government also claims that Matta consented to the procedure proposed by the district court. Specifically, the government points to the start of the conference, when the defense stated that their "only objection" was a request that the jury be allowed to "carry the ammunition in the presence, obviously, of the agent or of the CSO." It further identifies moments in which defense counsel responded in the affirmative to the district court's proposed procedure. If these snippets of the transcript comprised the entirety of the relevant discussion, we might readily conclude that the issue had been waived. See, e.g., United States v. Curran, 525 F.3d 74, 84 (1st Cir. 2008) (concluding that an

---

[11] When defense counsel insisted that the case agent could place the weapon on the table rather than handing it to the jurors, the district court retorted, "don't make a federal case out of it." The district court then interrupted counsel's attempted explanation and said, "[s]o that's it."

argument was waived where the defendant "was granted an explicit opportunity below to object . . . , affirmatively stated he had no objections, and did no more than express frustration over the existing state of the law"); United States v. Richardson, 14 F.3d 666, 669 n.1 (1st Cir. 1994) (noting that counsel gave "the judge a go-ahead signal" by saying "Fine" when asked about proposed procedure). The problem is that although defense counsel may have initially claimed to have only one objection, the actual course of the conference revealed that the defense in fact had multiple objections to the proposed procedure, not only with respect to proximity between the case agent and the jury, but also regarding the jury's freedom to interact with the evidence. In such circumstances, our preservation policy does not require us to close our eyes and ears to clear expressions of disagreement, simply because a litigant's initial reaction to a proposal included a few words of affirmation. See United States v. Silva, 554 F.3d 13, 21 (1st Cir. 2009) (reviewing challenge to jury instruction as preserved where defendant "initially agreed with the instruction but later objected").

On this record in whole, Matta's objections were sufficient to preserve the issue because it was apparent that he thought that the proximity of the case agent and jury could negatively impact deliberations. See United States v. Pereira, 848 F.3d 17, 26-27 (1st Cir. 2017) (explaining that a party's

"objections suffice" because "the ground for the objection was obvious from the context in which it was made" (quotation omitted)).  We turn then to the merits.

The Sixth Amendment and due process give all criminal defendants the right to have their cases heard by an impartial jury.  Turner v. Louisiana, 379 U.S. 466, 471-72, 472 n.10 (1965).  Matta's claim is one of "juror misconduct," a broad term that captures not only a juror's personal biases or failure to obey a judge's instructions, but also conduct by individuals outside the jury that could impact a juror's impartiality.  United States v. Gastón-Brito, 64 F.3d 11, 12 (1st Cir. 1995) (analyzing claim that the prosecution's case agent made a hand gesture under "the broad rubric of juror misconduct").  When a party makes a colorable or plausible claim of juror misconduct, "the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial."  Id. (citation omitted).  The district court "has wide discretion to determine the scope of the resulting inquiry and the mode and manner in which it will be conducted."  United States v. Paniagua-Ramos, 251 F.3d 242, 250 (1st Cir. 2001). While the district court may hold an evidentiary hearing or conduct voir dire of individual jurors, we do not require it in every case, in deference to the district court's "superior 'feel' for the nuances of the case," which make it well-suited to craft a procedure for addressing a

- 29 -

case-specific claim of juror misconduct. Id. (quoting Neron v. Tierney, 841 F.2d 1197, 1201 (1st Cir. 1988)).

That said, we have referred to the trial judge's obligation to investigate juror misconduct as "an unflagging duty." Id. And our law makes clear that the district court "does not have discretion to refuse to conduct any inquiry at all . . . ." United States v. Lara-Ramirez, 519 F.3d 76, 87 (1st Cir. 2008).

Here, Matta's claim centers around the case agent's direct and personal contact with the deliberating jury. Such improper contact creates a concern that jurors will decide the case based (at least in part) on outside influence, rather than the evidence presented at trial. See Gastón-Brito, 64 F.3d at 12 (quoting United States v. Day, 830 F.2d 1099, 1103 (10th Cir. 1987)). The most obvious form of improper contact occurs when someone attempts to persuade a juror to decide the case a particular way (whether through reason, bribery, threats, or some other means). See, e.g., Remmer v. United States, 347 U.S. 227, 228 (1954) (describing incident in which unknown individual informed jury foreman that "he could profit by bringing in a verdict favorable to the [defendant]"); United States v. Tsarnaev, 96 F.4th 441, 451 (1st Cir. 2024) (describing Facebook comment made to juror which stated "[p]lay the part so u get on the jury then send him to jail where he will be taken care of"). However,

improper conduct can consist of more subtle interactions. There need not be any conversation about the case itself,[12] see United States v. Betner, 489 F.2d 116, 118-19 (5th Cir. 1974) (reversing conviction and remanding for a new trial where the district court did not investigate prosecutor's conversation with the jury beyond ascertaining that it was not about the pending case), nor any verbal communication at all. Even hand gestures and facial expressions can cause concern. See, e.g., United States v. Tejeda, 481 F.3d 44, 52 (1st Cir. 2007) (concluding that the trial judge conducted a sufficient investigation into a throat-slitting gesture made in view of jury); Gastón-Brito, 64 F.3d at 12-14 (vacating conviction and remanding for new trial where a case agent pointed at the defense table in view of the jury). The risk of improper influence is magnified when the outsider who interacts with the jury is affiliated with one of the parties in the pending case, because the jury's view of the evidence might be influenced by any positive or negative impression of the outsider. See, e.g., Paniagua-Ramos, 251 F.3d at 250 ("The proposition that private communications between jurors and prosecutors during the course of

---

[12] Of course, the fact that any contact between a juror and an outsider did not include conversations about the case itself might contribute to a district court's finding that no party was prejudiced as a result of the contact. See United States v. O'Brien, 972 F.2d 12, 14 (1st Cir. 1992) (affirming the district court's finding of no prejudice where an out-of-uniform police officer engaged in casual conversation with jurors in the hallway during a recess).

a criminal trial are absolutely forbidden is so elementary as to require no citation of authority."); Tejeda, 481 F.3d at 52-53 ("This case involves (1) a risk of a perception by a juror of an implicit threat from someone who might, in the juror's view, be associated with the defendant; and (2) the risk that this 'threat' might influence the juror's ability to impartially evaluate the evidence."); see also United States v. Freeman, 634 F.2d 1267, 1270 (10th Cir. 1980) ("The danger of improper influence adheres in every contact between an interested party and a jury.").

Matta's claim has another dimension, however. The potential prejudice in this case arose not only from the interaction between the case agent and jury, but also from the district judge's role in allowing an individual distinctly associated with one of the adversary parties to act as a neutral officer of the court and assistant to the jury. Although we have not squarely addressed this subcategory of juror contact claim, several of our sister Circuits have. In particular, we are persuaded by the reasoning of the Ninth Circuit in United States v. Pittman, which examined the propriety of sending the government's case agent into the jury room to assist the jury in playing a tape recording. 449 F.2d 1284, 1285 (9th Cir. 1971). The Ninth Circuit concluded that the case agent was thus presented "in a trustworthy, friend-of-the-jury capacity wholly at odds with the adversary posture in which [he] should be regarded by the jury

if the credibility of [the prosecution's] factual assertions is to be decided fairly." Id. at 1286. Here, as in Pittman, the case agent's affiliation with the prosecution was known to the jury: he was introduced as a member of the prosecution team at the beginning of trial, sat at the prosecution table throughout the trial, and assisted prosecutors with the presentation of at least one exhibit. The district court nevertheless allowed the case agent to take on a trusted role outside the presence of the other adversaries, ostensibly to ensure the jurors' physical safety. See id. at 1286; cf. Gonzales v. Beto, 405 U.S. 1052, 1055 (1972) (Stewart, J., concurring) ("Our adversary system of criminal justice demands that the respective roles of prosecution and defense and the neutral role of the court be kept separate and distinct in a criminal trial."). As a result, the jury might have viewed the prosecution as more objective and deserving of trust when assessing the parties' competing theories of the case.

At least three of our sister Circuits have severely restricted a district court's discretion to use an individual affiliated with an adversary party to assist a deliberating jury with its review of the evidence. These decisions recognize that the district judge's seal of approval enhances the risk that the interaction between the adversary and the jury will be prejudicial, but that such prejudice will be difficult to establish after the fact. For instance, Pittman opined that "the potential for

prejudice inherent in any adversary's intrusion into the jury room and the uncertainties in ascertaining the extent of such prejudice *require* the extreme measure of a new trial in cases where the invasion was at the direction of the court and not inadvertent." 449 F.2d at 1286 (emphasis added). Confronted with a similar set of facts in United States v. Florea, the Sixth Circuit set forth a prospective "per se rule" that "without prior stipulation a trial court should not permit any unauthorized person especially one associated with either prosecution or defense to communicate with or otherwise have any contact with a jury in any proceeding." 541 F.2d 568, 570, 572 (6th Cir. 1976).[13] This rule was "necessary . . . because although the danger of improper influence inheres in every contact between an interested party and a jury, actual prejudice may be difficult to establish." Id. The Tenth Circuit has also vacated a conviction and remanded for a new trial

---

[13] We note that although the Sixth Circuit did not find the improper contact in Florea violative of the defendant's due process rights because it was sufficiently limited, the court went on to utilize its "supervisory authority over the administration of justice" in its district courts, to announce its new rule prohibiting unauthorized persons from having contact with a jury. 541 F.2d at 571-72 (distinguishing Turner, 379 U.S. at 473, which involved "continuous and intimate association with a sequestered jury on three consecutive days"). But in determining that the defendant there had suffered no harm by the improper contact, the Sixth Circuit had the benefit of the district court's exploratory hearing at which the FBI agent who had played tapes for the jury and two neutral observers testified about what happened. Id. at 570-71. As we'll explain, the record does not permit us to reach a similar conclusion in this case, because the district court conducted no such inquiry.

under similar circumstances, ruling that "[a]bsent a stipulation by the parties and the approval of that stipulation by the court, the [FBI] agent should not have been in the jury room."  Freeman, 634 F.2d at 1269.

As he did below, Matta cites to Pittman, Florea, and Freeman and argues that the district court presented the case agent in "a trustworthy, friend-of-the-jury capacity wholly at odds with the adversary posture in which he should be regarded," thus necessitating a new trial.  In view of the risk that materializes any time an adversary party has contact with the jury —— a risk which was aggravated by the district judge's endorsement —— we think that Matta met his burden to set out a colorable claim of juror misconduct.[14]  At that point, we believe the district court had an "unflagging" duty to investigate.  Paniagua-Ramos, 251 F.3d at 250; see Gastón-Brito, 64 F.3d at 12.  As with any claim of juror misconduct, we ask whether the district court "fashion[ed], and then even-handedly implement[ed], a sensible procedure

---

[14] The government complains that Matta did not "ever ask for a hearing in his motion for a new trial," but does not argue that this amounted to waiver.  Nor did it identify any authority suggesting that a party's failure to request a hearing absolves the district court of its duty to investigate a claim of juror misconduct.  Any such requirement would seem contrary to the "unflagging" nature of the district court's duty.  See Paniagua-Ramos, 251 F.3d at 250; see also Freeman, 634 F.2d at 1269 (holding that where a party did not request a hearing on the FBI agent's presence in jury room, the district court "of its own motion should have ordered an immediate hearing").

reasonably calculated to determine whether something untoward had occurred[.]" Paniagua-Ramos, 251 F.3d at 249-50. The answer here is no, for the simple fact that the district court declined to make even a cursory inquiry.[15]

As a result, the district court's decision on the motion for a new trial simply assumed that the case agent had followed its instructions. The government echoes this assumption, claiming "there is no reason to believe the agent ever spoke to the jury while they handled the machineguns" and that "Matta has failed to show any prejudicial impact." This reasoning misses the point. The purpose of the investigation is to create a record of what occurred and what prejudicial effect, if any, existed. Without such an inquiry, there is no way to know whether the district court's instructions were followed, much less judge whether any aspect of the interaction between the case agent and the jury, including non-verbal interaction, would have prejudiced Matta. See Tsarnaev, 96 F.4th at 455 (explaining that it was not possible to determine whether a juror was dishonest because no one had asked the juror to explain himself). Because the error is the district court's failure to conduct an investigation, we do not require

---

[15] We need not adopt a new per se rule prohibiting the use of case agents to present evidence to the deliberating jury, as in Florea and Pittman, to resolve this case. Here, the district court's failure to investigate colorable claim of misconduct was erroneous in light of our existing precedent.

Matta to present evidence of the case agent's conduct or actual prejudice.[16] See Zimny, 846 F.3d at 468-70 (concluding that the district court erred by not investigating "a specific, nonspeculative impropriety . . . that could have been highly prejudicial to [defendant]"); Gastón-Brito, 64 F.3d at 13 (reversing where "the district court summarily concluded that even if the incident had occurred, no harm had inured to the defendants," but "made no effort whatsoever to see if [case agent's gesture to jury] was in fact harmless").

We are not persuaded by the government's assertion that the presence of the CSO and the marshal ameliorated any risk or prejudice. While we recognize that trial judges have sometimes relied on the supervision of a court officer, such as the courtroom deputy or CSO, to ensure that jury contact is non-prejudicial, see United States v. Pratt, 351 F.3d 131, 138 (4th Cir. 2003), the CSO and marshal were not lawyers. There is nothing on the record suggesting that either was trained or instructed to detect

---

[16] We note the parties debate the applicability of the presumption of prejudice articulated in Remmer, 347 U.S. 227, to the facts of this case. We need not reach the vitality and applicability of the Remmer presumption to resolve this appeal. See United States v. Bradshaw, 281 F.3d 278, 287-89 (1st Cir. 2002) (declining to extend Remmer presumption). The district court had a duty to investigate regardless of whether prejudice was presumed. See id. at 287-93 (affirming denial of motion for mistrial where the district court conducted a sufficient investigation while declining to apply Remmer presumption); Gastón-Brito, 64 F.3d at 13 (recognizing that a "danger of prejudice" existed "regardless of the presumptions employed").

potentially subtle and innocent conduct by the case agent that might have improperly influenced the jury.[17]  See United States v. Brown, 832 F.2d 128, 130 (9th Cir. 1987) (explaining that appellate court could not conclude that "no prejudicial contact occurred" because "[s]uch contact could be very subtle, such as a nod . . . [and] might have been unintended, or even unnoticed by the case agent himself").  Moreover, at the risk of sounding like a broken record, we do not know what the CSO or marshal observed, because the district court never asked.  See Tsarnaev, 96 F.4th at 455.  Thus whatever assurances the CSO or marshal might have provided are not part of the record.

Similarly, we are unmoved by the district court's reasoning, adopted by the government on appeal, that its procedure was designed around juror safety.  If this safety purpose was "transparent," as the district court claims, it would seem to magnify the risk of prejudice, if anything, by enhancing the jury's perception of the agent's trustworthiness and importance.  See Turner, 379 U.S. at 474 (explaining that where prosecution witnesses were used as jury bailiffs, the fairness of the trial was impeded by "jurors' confidence in those who were their official

---

[17] The district court's order on the motion for a new trial noted that the CSO took an oath after closing arguments to "not permit any person to speak to or communicate with" the jury.  It is not evident whether the CSO understood this as an oath to also shield the jury from non-verbal communications.

guardians"). It is not apparent on this record why safety required the presence of the case agent, as opposed to a neutral party like the CSO, especially where the firearms had been disabled. Cf. State v. Newson, No. M2021-00444-CCA-R3-CD, 2022 WL 2251303, at *11 (Tenn. Crim. App. June 23, 2022) (affirming the trial judge's response to a jury's request to view a gun by permitting a court officer to take the gun to the jury room).

In a letter submitted under Federal Rule of Appellate Procedure 28(j), the government also suggested the district court was influenced by Local Rule 123. Local Rule 123 generally requires that evidence submitted during a trial be "held in the custody of the clerk . . . , except that exhibits which because of their size or nature require special handling shall remain in the possession of the party introducing them." D.P.R. Loc. R. 123(c)(1)(A). Weapons qualify as "sensitive exhibits," id. 123(d)(1), which "shall remain in the custody of the arresting or investigating agency during the trial of the case," id. 123(e). While neither party has questioned the validity of the local rule, no such rule can be applied with blind disregard for Matta's constitutional right to trial by an impartial jury. See United States v. Panzardi Alvarez, 816 F.2d 813, 817 (1st Cir. 1987) ("Local rules of court designed to regulate attorney conduct cannot unduly handicap the constitutional right of an accused to counsel of his choice."). In other words, where a colorable claim of juror

misconduct arises, the district court cannot shirk its duty to investigate by claiming it took a path that complied with the Local Rules.

We acknowledge that the government has pointed out some distinctions between the present case and others in which a conviction is overturned based on an improper and potentially prejudicial contact between an adversary and the jury. For instance, in many cases, the individuals who were in contact with the jury served as prosecution witnesses. See, e.g., Turner, 379 U.S. at 473-74; Pittman, 449 F.2d at 1285. And the contact between the case agent in this case was not as extensive as in Turner. See 379 U.S. at 468 (explaining that the deputies doubling as jury bailiffs and government witnesses drove the sequestered jurors to their meals and lodgings, had meals with the jurors, conversed with the jurors, and ran errands for the jurors). But these distinctions go to whether the contact in the present case was prejudicial. We do not think they undermined the fact that Matta's claim of juror misconduct was colorable and necessitated some sort of inquiry in the first instance.[18] As we have said, the situation

_____

[18] One distinction proposed by the government which we find unpersuasive is the assertion that this case is different because the improper contact occurred in the courtroom itself, rather than in the jury room. In our view, the "sanctity" of the jury room referred to in Pittman arises from the presence of the deliberating jury, not from the room itself. 449 F.2d at 1285. The case law demonstrates that events supporting a colorable juror misconduct

presented here, wherein the district court treated an individual affiliated with one of the parties as a friend to the jury, trusted to assist them in their deliberations, was sufficient to establish a colorable basis of juror misconduct. See Pittman, 449 F.2d at 1286. In similar cases, judges were not excused of any duty to investigate the claimed misconduct simply because the case agent was not called as a witness and did not socialize with the jury over an extended period. See Gastón-Brito, 64 F.3d at 13 (involving gesture made by case agent who was not identified as a witness). The failure to conduct any inquiry was an abuse of discretion. See Zimny, 846 F.3d at 468; Gastón-Brito, 64 F.3d at 13; cf. Lara-Ramirez, 519 F.3d at 87, 89 (concluding that decision to declare a mistrial without conducting a sufficient investigation into a "colorable claim of juror taint" was an abuse of discretion).

We further acknowledge that the government and the district court cite cases from some of our sister Circuits upholding convictions when individuals affiliated with the prosecution briefly interacted with jury members, including to facilitate the jury's review of the evidence. But the nature and posture of defendants' claims in some of those cases are distinguishable. See Pratt, 351 F.3d at 138-139 (noting that

---

claim can occur outside the jury room. See Gastón-Brito, 64 F.3d at 12 (describing gesture made in courtroom).

"[t]he risk attendant to the practice of sending a [drug enforcement agent] into the jury room to cue up an audiotape on a tape recorder is sufficiently great that we do not condone it," but holding that procedure did not violate defendant's right to be present at every stage of trial per Fed. R. Crim. P. 43); Scott v. Culliver, 342 F. App'x 525, 530 (11th Cir. 2009) (affirming Alabama Supreme Court's denial of habeas relief where petitioner argued that trial counsel's performance was deficient for failing to seek mistrial based on prosecution witness who served as jury bailiff); Lee v. Marshall, 42 F.3d 1296, 1298-99 (9th Cir. 1994) (explaining that although police officers' unauthorized entry into jury room was erroneous, there was no specific showing of prejudice as required for successful collateral challenge to conviction). In others, affirmance was based on the district court's findings after an inquiry into the circumstances of the jury contact. See, e.g., United States v. Stephenson, 183 F.3d 110, 116 (2d Cir. 1999) (describing voir dire of jurors following encounter with government witnesses); Day, 830 F.2d at 1101-02 (describing the district court's questioning of an FBI agent who spoke to a juror in the restroom); United States v. Harrell, 788 F.2d 1524, 1528 (11th Cir. 1986) (affirming findings from a hearing in which the government's expert witness testified about providing a deliberating jury assistance with a mini-cassette player). We reiterate the chief problem in this case was the district court's

failure to investigate Matta's nonfrivolous claim of juror misconduct, and thus we have no basis on which to hold that the contact, even if ill-advised, was harmless and non-prejudicial. And although the district court cited some of this out-of-Circuit case law in denying Matta's new trial motion, it never addressed binding precedent in this Circuit requiring it to conduct a reasonable inquiry in response to a colorable claim of jury misconduct. See Zimny, 846 F.3d at 468; Gastón-Brito, 64 F.3d at 13.

In short, we find that the district court erred by refusing to investigate Matta's colorable claim of juror misconduct, thereby depriving Matta of any ability to show prejudicial effect. Given the passage of time, we do not think remanding for an investigation into this matter is viable. See Betner, 489 F.2d at 119 (reversing and remanding for a new trial where "so many months of delay" would make a remand for a hearing on the juror misconduct issue unreliable); Freeman, 634 F.2d at 1269 (recognizing the difficulty in distinguishing between juror testimony allowed and prohibited by Fed. R. Evid. 606(b) if remanded for hearing on juror misconduct). The juror misconduct in this case is not supported by written evidence and did not involve "strange events unfold[ing] in such a tense environment" that the individuals involved are likely to still remember what occurred. Cf. Zimny, 846 F.3d at 472 (remanding for further

investigation into highly prejudicial blog comments made by juror whose conduct "annoyed" several other jury members, while acknowledging that if "memories have faded" the district court can determine if a new trial is warranted); Tsarnaev, 96 F.4th at 475 (remanding to district court to conduct investigation into juror bias "suggested by the apparent discrepancies between" jurors' answers in selection process and "their social media communications" about highly-publicized death penalty case). Instead, here, the risk of prejudice is clear, but evidence of prejudice may be subtle and difficult to ascertain. See Pittman, 449 F.2d at 1286 (holding that such uncertainties "*require* the extreme measure of a new trial" (emphasis added)). Accordingly, we believe the most prudent course of action is to vacate Matta's convictions and sentence on the possession and remand for a new trial. See Gastón-Brito, 64 F.3d at 13 (vacating convictions and remanding for new trial). And as we've already explained, a new trial will not implicate any double jeopardy issue because there was sufficient evidence to support the vacated convictions.

Before moving on, we address Matta's request that we "vacate the consecutive 18-month revocation sentence and remand for resentencing on the technical violations."[19] The government

---

[19] These "technical violations" apparently include use of controlled substances and changing his residence without Probation's prior approval. Matta is not asking us to vacate the

- 44 -

takes no position on the revocation sentence. The revocation hearing transcript shows the district court considered Matta's gun related convictions the "most serious violation" and a Grade A violation, which in turn determined the guidelines range. U.S. Sent'g Guidelines Manual § 7B1.1(a)(1) (defining Grade A violation as "conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that . . . involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a)"); see id. § 7B1.4 (recommending terms of imprisonment based on violation grade and criminal history category). There was no fact finding by the district court regarding Matta's prohibited possession of firearms independent of the convictions. In light of the government's silence, we have no reason to believe that the district court would have imposed the same sentence if presented with a lower Guidelines range. Therefore we also vacate the revocation of supervised release sentence and remand for resentencing. See United States v. Jones, 930 F.3d 366, 382 (5th Cir. 2019) (vacating revocation of supervised release alongside conviction where the district court "made no independent factual findings as to [the defendant's] underlying criminal conduct").

---

revocation and reinstate his release, presumably because he does not dispute these less serious violations.

## III. <u>Evidentiary Rulings</u>

Having explained why we think vacating the convictions and remanding for a new trial is the appropriate remedy for the juror misconduct in this case, we need not reach Matta's remaining arguments to resolve this appeal. That said, we briefly address two claims of evidentiary error advanced by Matta to avoid repetition of the same errors on remand. See <u>United States</u> v. <u>Velazquez-Fontanez</u>, 6 F.4th 205, 223 (1st Cir. 2021) (addressing an evidentiary issue "likely to arise at any retrial" despite vacating for an independently reversible error). And we address these evidentiary challenges with the benefit of good appellate briefing from both parties. Our review is for abuse of discretion. See <u>Sec'y of Lab.</u> v. <u>DeSisto</u>, 929 F.2d 789, 796 (1st Cir. 1991) (reviewing evidentiary determinations for abuse of discretion although the case was reversible on other grounds "to ensure that they do not recur").[20]

### A. Form 302

First, Matta wished to impeach Officer Vidal's testimony based on an interview Vidal had with FBI agent José Rosario ("Agent

---

[20] Because the juror misconduct issue provides an independent basis for vacating the conviction, we need not address whether any evidentiary errors were harmless (and thus not a basis for reversing the conviction). <u>United States</u> v. <u>Gonzalez-Maldonado</u>, 115 F.3d 9, 17 n.2 (1st Cir. 1997) (declining to "engage in a harmless error analysis" where the case would be reversed and remanded on other grounds).

Rosario") after Matta's arrest. Agent Rosario authored a report of what Officer Vidal said in the interview. (We'll refer to this report as the "Form 302" because the FBI classifies the form on which the report was written as FD-302.) That Form 302 stated, "Four individuals were at the drug point area, Strike Force members identified themselves as police and the individuals started running away." This conflicts with Officer Vidal's trial testimony that Matta was alone at the scene of his encounter with police and it supports Matta's theory that the contraband belonged to someone else. The parties formulate the issue on appeal in somewhat imprecise terms: they contest whether Matta could "use" this Form 302 to impeach Vidal or impeach Vidal "with" the Form 302, even though Agent Rosario wrote the Form 302. As our analysis is about to show, "using" a document to impeach a witness could mean several things.

The government claims Matta wanted to introduce the Form 302 as extrinsic evidence of Vidal's prior inconsistent statement under Federal Rule of Evidence 613(b), a possibility that Matta's reply brief leaves open. Our Circuit has not definitively ruled on the admissibility of a document purporting to memorialize a witness's prior inconsistent statement when the document is

authored by someone other than said witness.[21]  But we find persuasive the majority view, which requires the proponent of such a document to show that the document is a substantially verbatim transcription, in the witness's own words, or signed, adopted, or subscribed by the witness.  See, e.g., Carnell Const. Corp. v. Danville Redev. & Hous. Auth., 745 F.3d 703, 718-19 (4th Cir. 2014); United States v. King, 424 F. App'x 389, 396 (5th Cir. 2011); United States v. Schoenborn, 4 F.3d 1424, 1428-29, 1429 n.3 (7th Cir. 1993).[22]  We think that the Fourth Circuit put it best when it said that the prior inconsistent statement must be "reasonably attributable" to the witness being impeached.  United States v. Barile, 286 F.3d 749, 758 (4th Cir. 2002).  Thus, if Matta wants to introduce the Form 302 as an exhibit, he will have to lay a foundation by showing that the Form 302 reflected Vidal's

_____

[21] Matta cites to a footnote in which of one member of this court stated that there was "no basis in the rules of evidence or the common law of impeachment" for a district court to permit the defendants to call law enforcement officers for impeachment purposes if they authored interview summaries signed by the witnesses, but not officers whose interview summaries were not signed by the witnesses.  United States v. Catalán-Roman, 585 F.3d 453, 464 & n.12 (1st Cir. 2009) (opinion of Lipez, J.), as amended (Dec. 23, 2009).  Not only was this footnote non-precedential, the authoring judge was addressing whether a defendant should have been permitted to impeach a witness by calling others to testify as to the witness's prior statements, not whether the defendant should have been allowed to submit documents authored by others as extrinsic impeachment evidence.  Id. at 464.

[22] See also United States v. Saget, 991 F.2d 702, 710 (11th Cir. 1993); United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992); United States v. Hill, 526 F.2d 1019, 1026 (10th Cir. 1975).

own words or that Vidal signed, adopted or subscribed to the statement.

That said, the parties apparently agree that Matta, nonetheless, should have been allowed to appropriately "use" the information contained in the Form 302 to formulate his cross-examination questions about statements Vidal made to police. We concur that "a witness's prior oral statement may be the subject of cross-examination" and whether the prior oral statement "happens to have been recorded in writing" should not limit counsel from simply asking the witness about that statement. Jankins v. TDC Mgmt. Corp., 21 F.3d 436, 442 (D.C. Cir. 1994); see United States v. Meserve, 271 F.3d 314, 320 (1st Cir. 2001) ("Pursuant to the Federal Rules of Evidence, a witness's credibility may be impeached by asking him about prior inconsistent statements."). Yet when defense counsel asked Officer Vidal whether he spoke with federal agents about Matta's arrest, the district court sustained the government's objection on the ground that Matta was "[i]mpeaching with another person's statement." The government claims that the district court did not intend to bar all questioning about Vidal's prior statement and faults Matta for "not clarify[ing] that he merely wanted to ask a question about the interview without using the 302." But at the time the government lodged its objection, Matta had not yet mentioned the Form 302 in his questioning. Combined with the district court

telling counsel, "[y]ou cannot impeach him," we think the district court effectively cut off all attempts by defense counsel to ask Officer Vidal about the statement recorded in the Form 302. This was an abuse of discretion.[23] See Bergus v. Florian, 120 F.4th 14, 25, 28 (1st Cir. 2024) (concluding that district court correctly precluded extrinsic evidence of witness's character but abused its discretion by not allowing cross-examination attacking witness's character for truthfulness); United States v. Pridgen, 518 F.3d 87, 91 (1st Cir. 2008) (concluding that district court erred in not allowing witness to be impeached by testimony about prior inconsistent statement).

We further clarify that we impose no strict rule against Matta referring to or reading from the Form 302 without showing that Vidal signed or adopted it, something the government seems to advocate for. See Jankins, 21 F.3d at 442 (rejecting argument that counsel should not have been permitted to "read[] from the investigator's notes" of his conversation with witness); see also Great W. Cas. Co. v. Rodriguez-Salas, 436 F. App'x 321, 325-26

---

[23] Cutting off cross-examination might well have prevented Matta from laying a foundation for admission of the Form 302. See United States v. Brika, 416 F.3d 514, 529 (6th Cir. 2005) (noting that a witness's police statement could be used for impeachment where she signed and adopted it and "upon examination, [she] acknowledged that she recognized the document as the statement she had given to the police"); cf. United States v. Gonzalez-Melendez, 570 F.3d 1, 4 (1st Cir. 2009) (explaining, in another context, that "a witness may orally adopt a statement, even if he has reviewed the statement only aurally").

(5th Cir. 2011) (holding that witness was not required to adopt transcript of telephone conversation before counsel could read from the transcript to impeach witness).  Cases prohibiting the "use" of an investigator's report that has not been signed or adopted by the witness do not uniformly forbid any line of questioning that reads from the report.  Compare United States v. Adames, 56 F.3d 737, 744 (7th Cir. 1995) (concluding that district court did not abuse discretion where it allowed lawyer to "continue" to "read directly from the agent's written summary" over the government's objection, but also instructed lawyer that he must "lay a foundation that the statement was [witness]'s or had been adopted by [witness]" before "it could be used for impeachment"), and Hill, 526 F.2d at 1026 & n.5 (noting that "counsel was allowed to question based upon the information in the 302 statement" though he failed to frame the question in a non-argumentative manner), with Saget, 991 F.2d at 710 (reasoning that by "reading directly from the agent's summary," defense attorney was "[i]n effect . . . introducing extrinsic evidence to the jury of [witness's] prior inconsistent statement via the FBI agent's summary").  In our view, cross-examination questions that quote from a document are not always improper attempts to introduce the

document itself into evidence.[24]  See Great W. Cas., 436 F. App'x

at 327 ("Counsel who uses a statement as impeachment is not

required to introduce it into evidence."); but see Saget, 991 F.2d

at 710.  This case is a prime example:  there are only so many

ways to characterize a statement about seeing four other

individuals at the scene of Matta's arrest.  And while the Form

302 may not reflect Officer Vidal's exact words, forcing Matta's

lawyers to paraphrase Agent Rosario's summary of Vidal's prior

statement, instead of just quoting from the Form 302, might enhance

the risk of abstraction and inaccuracy.  See Great W. Cas., 436 F.

App'x at 326 (explaining that although a lawyer's lengthy

quotations from the written document may be prejudicial, "the more

abstract the interrogator's summary, the more susceptible it

becomes to an objection for being unrepresentative or

misleading").

In short, while Matta must show that the Form 302

statement is reasonably attributable to Officer Vidal (for

---

[24]  Of course, counsel's recitation from the document may be problematic in specific cases, such as when it creates confusion as to the authorship of the document, Jankins, 21 F.3d at 442, or "plac[es] highly prejudicial language before the jury," Great W. Cas., 436 F. App'x at 326.  But a trial judge retains the tools to combat any potential prejudice.  See Jankins, 21 F.3d at 442 ("[T]here was obviously no obstacle to the court's issuing suitable instructions to counsel, or simply instructing the jury that the paper in counsel's hand was not signed or approved by [the testifying witness].");  Great W. Cas., 436 F. App'x at 325 (emphasizing "district court's inherent power to control the trial[ and] the availability of limiting instructions").

instance, that the report was a substantially verbatim transcript or that Officer Vidal signed, adopted, or subscribed to the report) before he could introduce the Form 302 as an exhibit, he should nevertheless be permitted to cross examine Officer Vidal about prior statements he made to federal agents, including those recorded in the Form 302, without such a showing.

**B.    Receipt for Property Form**

Next, Matta sought to introduce a document titled "Receipt for Property," authored by United States Probation Officer Grace Moringlane ("PO Moringlane") as a business record. (We'll refer to this as the "Receipt Form" for short.)  The Receipt Form indicated Agent Rosario transferred the seized cell phones to Probation for forensic analysis shortly after Matta's arrest.  In a field labeled "Location Where Property Was Obtained," Moringlane wrote "seized by FBI.  Inside of client's pockets."  At trial, Matta admitted that the Receipt Form was hearsay, but contended that it fit under the business records exception.  Fed. R. Evid. 803(6).  The defense called PO Moringlane to lay a foundation for the admission of the Receipt Form as a business record.  But shortly after her testimony began, the district court sustained a renewed hearsay objection by the government and dismissed PO Moringlane from the witness stand, disallowing any further testimony on her part.  Before us, neither party disputes that the Receipt Form itself is a business record subject to the hearsay

exception.  Instead, the government says the Receipt Form contained another layer of hearsay to which the business records exception did not apply:  namely, information about where the cell phones were seized came from a statement Agent Rosario made to PO Moringlane.  After careful review, we think the district court was too hasty in accepting the government's view of the law and that it abused its discretion by ignoring factors which would have suggested that the business records exception could apply to the multiple levels of hearsay in the Receipt Form.  Bergus, 120 F.4th at 24.  Here's why.

We have previously stated that "the business records exception does not embrace statements contained within a business record that were made by one who is *not* a part of the business." United States v. Vigneau, 187 F.3d 70, 75 (1st Cir. 1999).  But that pronouncement does not amount to a "categorical rule" against application of the exception to a business record containing information received from an individual outside the business that keeps the record.  See U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Jones, 925 F.3d 534, 537 (1st Cir. 2019).  To understand when and why the business records exception might apply to multiple levels of hearsay, it is helpful to consider the rationale behind the exception:  namely that "the regularity of the procedure" in creating and maintaining the record, "coupled with business incentives to keep accurate records, provide

reasonable assurance" of the record's reliability. Vigneau, 187 F.3d at 75. Using this logic, courts admit records containing multiple layers of hearsay when a chain of employees, all acting in the regular course of business, conveys information to a co-worker who duly records it. See McCormick on Evid. § 324.1 (9th ed. 2025) (explaining that "no further exception need be invoked" where a business record includes a further hearsay statement if both "statements are by persons acting in the routine of the business" (footnote omitted)); United States v. Baker, 693 F.2d 183, 188 (D.C. Cir. 1982) ("If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6).").

"[A]n essential link in the trustworthiness chain fails," however, if the business record contains information passed along by someone who was not acting in the regular course of business, such as an outsider to the business. McCormick, supra, § 290 (Feb. 2025). The classic example is a police report containing information a witness provided to the police officer who authored the report. Vigneau, 187 F.3d at 75 (citing Johnson v. Lutz, 170 N.E. 517 (N.Y. 1930)). Although the police officer who writes the report is acting in the regular course of business, the witness talking to the officer is not. Id. at 75-76. Thus, the justification behind the business records exception cannot be

invoked. See Fed. R. Evid. 803, advisory committee's notes to 1972 proposed rules (explaining that if "the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself"). Analogizing to this classic case, we have rejected the application of the business records exception to documents containing information that customers provide to businesses or patients provide to medical professionals. Bradley v. Sugarbaker, 891 F.3d 29, 35 (1st Cir. 2018) (affirming the exclusion of information a patient provided the hospital about other medical providers' opinion on her condition); Vigneau, 187 F.3d at 74, 77 (affirming the exclusion of a bank's money transfer form containing the name, address, and telephone number of money sender); Petrocelli v. Gallison, 679 F.2d 286, 290 (1st Cir. 1982) ("Where the declarant is a hospital patient, his relating of his own history is not part of a 'business' routine in which he is individually a regular participant.").[25]

However, there may be circumstances in which information derived from someone outside the business is still "reliable enough to be admissible." U.S. Bank, 925 F.3d at 538 (quoting FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010)).

---

[25] In the medical context, a patient's statement describing their medical history for the purpose of diagnosis or treatment may nevertheless be excepted from hearsay under Fed. R. Evid. 803(4).

Reliability "is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." Id. (quoting Fed. R. Evid. 803 advisory committee's note to 1972 proposed rules). Accordingly, we have permitted the admission of records containing third-party information where the third-party information was "intimately integrated" into the business records, or the business maintaining the records "relied on" the third-party information to conduct its own business. Id. at 537-38 (first quoting Direct Mktg., 624 F.3d at 16 n.15; and then quoting United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992)). And although we have not previously put words to such a rationale, a common theme seems to be that "outsider" information is sufficiently reliable to be admitted under the business records exception when the outsider was also acting within the regular course of business or under a "business duty" to provide accurate information. See U.S. Bank, 925 F.3d at 537-38 (holding that mortgage records from prior loan servicers which were integrated into current loan servicer's database could be introduced as business records of current servicer); Direct Mktg., 624 F.3d at 16 & n.15 (affirming admission of records showing defendants' gross receipts which may have been based on "third party data"); see also Peak v. Kubota Tractor Corp., 559 F.

- 57 -

App'x 517, 523 (6th Cir. 2014) (explaining that "triple-level chain of hearsay" was admissible because dealer had a contractual duty to submit warranty claims to manufacturer and dealer's employees were working in the regular course to diagnose technical problem); United States v. Ary, 518 F.3d 775, 787 (10th Cir. 2008) (affirming admission of museum inventory records that relied on third-party sales invoices and documentation, because those third parties were under a business duty to provide accurate information in their invoices).

With these principles in mind, we turn to the government's assertion that the Receipt Form presents a double hearsay problem.[26] In sustaining the government's objection, the district court seemingly accepted at face value the government's statement of the law:  because the statement about the location of seizure was "a statement from someone outside of the organization," the defense "would need another exception to get that particular statement in."  But as we have just explained, that is not necessarily true.  The face of the Receipt Form and the parties'

---

[26] We assume for the purposes of this opinion that a double hearsay issue exists.  At trial, Matta's attorneys claimed they did not seek to use the Receipt Form to "prove the truth of the incorporated statement" (which would have meant there was no second level of hearsay.)  But Matta's appellate briefs do not repeat this argument.  Indeed Matta seems to suggest that the jury should have been allowed consider the Receipt Form as substantive evidence in determining "whether the cellphone was recovered from Mr. Matta or from the [feed] bag."

representations regarding the incorporated statement reveal several indicators of reliability.

The parties seem to agree that both Agent Rosario and PO Moringlane were operating in the regular course, which makes Agent Rosario's information more reliable than that received from the classic "outsider" (such as a witness making a police report or a customer sending money at the bank). Both Agent Rosario and PO Moringlane also would have sworn an oath to "faithfully discharge the duties of [their] office[s]." 5 U.S.C. § 3331. Those duties presumably involve accurately reporting where evidence was seized and establishing a chain of custody, to ensure that the evidence would be admissible and be given all due weight by the factfinder. See United States v. Williams, 809 F.2d 75, 89-90 (1st Cir. 1986) (noting defendant was "free to argue to the jury that they could accord less weight to this evidence" because the government failed to call witness to testify or "to present documentary evidence of the chain of custody between the technician and the chemist" who worked in state forensic laboratory). Indeed, the phrase "Chain of Custody" appears at the top of the second page of the Receipt Form, next to the words "Receipt For Property."

The government claims that "[t]he location of where the property was seized was irrelevant for forensic analysis purposes" and "nothing supports the conclusion that the probation office had a self-interest in assuring the accuracy of whether [the phones

were] seized from Matta's pockets or a bag he threw." This belies common sense. Probation was conducting a forensic analysis of Matta's phone presumably to determine whether Matta had violated criminal statutes or his conditions of supervised release. See 18 U.S.C. § 3603(2), (7), (10). The location of the seizure, as the parties' vigorous dispute in this case amply demonstrates, could be relevant to whether Matta committed any violation of his supervised release, and a lapse in the chain of custody might well "undercut the reliability of physical evidence" against Matta in a revocation proceeding. See United States v. Patrick, 248 F.3d 11, 22 (1st Cir. 2001) (explaining when inadequacies in police investigation may affect admissibility of evidence), overruled on other grounds by United States v. Salvador-Gutierrez, 128 F.4th 299 (1st Cir. 2025); United States v. Portalla, 985 F.2d 621, 622 (1st Cir. 1993) (stating that evidence in revocation proceedings must be reliable).

Rational minds may differ as to whether a business record containing a hearsay statement from an outsider is sufficiently reliable to be admissible. Certainly, as the government points out, there is no evidence that PO Moringlane or any other Probation employee independently confirmed the accuracy of Agent Rosario's

statement.[27]  But given the indicia of reliability we have identified here, the district court abused its discretion by sustaining the government's objection, at least without further analysis.  See Bergus, 120 F.4th at 24 (explaining that "district court abuses its discretion when it overlooks 'a relevant factor deserving of significant weight'" (quoting Soler-Montalvo, 44 F.4th at 14)).

## CONCLUSION

We vacate Matta's convictions and related sentence for possession of a firearm as a prohibited person and for possession of a machinegun, and remand for further proceedings consistent with this opinion.  We further vacate the sentence imposed based on the revocation of his supervised release and remand for resentencing.

---

[27] The government also claims we can infer the location of property seizure was unimportant because other fields on the Receipt Form were left blank.  We are skeptical that because some fields are blank, we should assume the filled-in fields are immaterial.